**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SLATER BRENNAN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>LATCH, INC. f/k/a TS INNOVATION ACQUISITIONS CORP., LUKE SCHOENFELDER, GARTH MITCHELL, and BARRY SCHAEFFER,<br><br>    Defendants. | Case No. 1:22-cv-07473-JGK<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION .................................................................... 1

II.    JURISDICTION AND VENUE ............................................................. 4

III.   PARTIES ................................................................................................ 4

IV.   SUBSTANTIVE ALLEGATIONS ........................................................ 6

      A.     Background ............................................................................. 6

      B.     Defendants' Revenue Recognition Practices Violated GAAP and Latch's Accounting Policies Misleading Investors ............................................. 12

      C.     False and Misleading Statements During the Class Period ................................ 22

      D.     The Truth Emerges ............................................................... 29

      E.     Latch Terminates Executives, Loses its NASDAQ Listing, and Fails to Timely Restate Its Results ........................................................... 30

V.     PLAINTIFF'S CLASS ACTION ALLEGATIONS ............................ 33

VI.   APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET .............................................................................................. 35

VII.   COUNTS ............................................................................................... 37

VIII.   PRAYER FOR RELIEF ...................................................................... 42

IX.   DEMAND FOR TRIAL BY JURY ..................................................... 42

1.      Lead Plaintiff VP PTC Establishment as Trustee of Gersec Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Latch, Inc. ("Latch" or "Company"), analysts' reports and advisories about the Company, consultations with accounting experts, interviews with former Company employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

2.      This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired Latch common stock between May 13, 2021, and August 25, 2022, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      On August 10, 2022, Latch, an enterprise technology company, offering a full-building operating system, disclosed on Form 12b-25 that it was unable to file with the United States Securities and Exchange Commission ("SEC") its quarterly report on Form 10-Q. The Company's Audit Committee, it disclosed, "has commenced an investigation (the "Investigation") of alleged current and prior period matters that include, but may not be limited to, certain aspects of the Company's current and historic key performance indicators and revenue recognition

1

practices, including the accounting treatment, financial reporting and internal controls related thereto."

4.      On August 25, 2022, after the market closed, Latch revealed that its financial statements for 2021 and the first quarter of 2022 were materially false. The Company warned that the Audit Committee's preliminary findings demonstrated that investors, creditors, and others should no longer rely upon those financial statements "as a result of material errors and possible irregularities relating to, among other things, the manner in which the Company recognized revenue associated with the sale of hardware devices during 2021 and the first quarter of 2022." Latch determined to restate those financial statements.

5.      The Company also stated that "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures." That is, Latch suffered from "one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods" that only a quarter earlier it had stated that it was remediating.

6.      On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022, on unusually heavy trading volume.

7.      On May 16, 2023, Latch filed with the SEC a Form 12b-25, warning further that investors should not rely on any of the Company's financial statements for 2019 and 2020 and promising a restatement of those financial statements, interim and annual, in addition to financial statements for 2021 and the first quarter of 2022. The issues relating to those earlier financial statements were the same, "result[ing from] internal control deficiencies and errors relating to the manner in which the Company recognized revenue."

8. As of the date of this Complaint, even as Latch announced the preliminary results of its Investigation in short order—requiring restatement of materially false financials—Latch has not restated or otherwise updated markets on its restatement of over 3 years of false financial statements. Latch publicly set deadlines for restating its financials, only to miss those deadlines without substantive update. Neither has Latch filed any subsequent financial statement for the more than five quarters since announcing that 3 years of its periodic financial statements were materially false.

9. On August 9, 2023, Latch disclosed that the Nasdaq Stock Market LLC ("Nasdaq") would "suspend trading of the company's securities on August 10, 2023 and commence delisting procedures because of the company's failure to meet the August 4, 2023 deadline to regain compliance with its periodic filing obligations." A year after first disclosing the material falsity of its financial statements, "[t]he company was unable to meet the deadline due to unexpected delays in the ongoing restatement of its historical financial statements."

10. According to former employees, from Latch's business combination that made it a public company, it issued materially false and misleading financial statements, audited and unaudited. During the Class Period, with knowledge or severely reckless disregard, Defendants improperly recognized revenue for hardware that Latch never actually sold, reporting these materially overstated revenue figures in periodic financial statements. Defendants concealed that from 2019 through the first quarter of 2022, Latch materially misstated revenue, in violation of GAAP as well as its own accounting policies, improperly recognizing revenue (a) based on non-binding Letters of Intent ("LOIs") that were simply agreements locking in prices for potential customers, through the fourth quarter of 2021; (b) based on moving hardware to warehouses owned

by its channel partners without a necessary change in control; and (c) by improperly valuing sales transactions.

11.     As the direct and proximate result of Defendants knowing or reckless wrongdoing, Plaintiff and other Class members suffered damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District. Latch's primary executive offices are located in this District.

15.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

16.     Lead Plaintiff, VP PTC Establishment as Trustee of Gersec Trust, as set forth in its previously filed PSLRA Certification (Dkt. No. 22-2), acquired Latch common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

17.     Defendant Latch is a Delaware corporation with its principal executive offices located in New York, New York. During the Class Period, Latch's common stock traded on the

NASDAQ exchange under the symbol "LTCH," and its warrants traded on the NASDAQ exchange under the symbol "LTCHW."

18.     Defendant Luke Schoenfelder ("Schoenfelder") was Latch's Chief Executive Officer ("CEO") until January 11, 2023.

19.     Defendant Garth Mitchell ("Mitchell") was Latch's Chief Financial Officer ("CFO") until March 28, 2022.

20.     Defendant Barry Schaeffer ("Schaeffer") served as Latch's Interim CFO from March 28, 2022, until January 11, 2023.

21.     Defendants Schoenfelder, Mitchell, and Schaeferr (together, "Individual Defendants") each:

a.  directly participated in the management of the Company;

b.  was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

g.  approved or ratified these statements in violation of the federal securities laws; and

h.  signed false SOX certifications.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

22.     Founded in 2014, Latch is an enterprise SaaS provider to buildings and residents. According to the Company, its product is "a full-building operating system, LatchOS, which addresses the essential requirements of modern buildings." According to Latch, "LatchOS streamlines building operations, enhances the resident experience and enables efficient interactions with service providers. Our product offerings," the Company continued, "designed to optimize the resident experience, include smart access, delivery and guest management, smart home and sensors, connectivity and personalization and services." Latch, Defendants continued, "combine[s] hardware, software and services into a holistic system that makes spaces more enjoyable for residents, more efficient and profitable for building operators and more convenient for service providers."

23.     Latch became a public company through the Business Combination with TSIA, a publicly traded special purpose acquisition company launched by Tishman Speyer Properties, L.P. ("Tishman Speyer").

24.     For 2019, 2020, 2021, and the first quarter of 2022, Latch violated GAAP and its own accounting policies.

25.     Latch sold and sells hardware through its channel partners. In the May 13, 2021, prospectus / proxy statement on Form 424b3 ("Proxy") soliciting stockholder approval of the Business Combination, Latch explained that "[w]e sell hardware to building developers through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer."

6

26.     Hardware sales were material to the Company. In non-GAAP measures, the Company estimated that in 2020, according to Latch's materially false, audited financial statements, "Hardware Bookings" were $72 million, 44% of total bookings. In 2021, Hardware Bookings were $138 million, 38% of total bookings.

27.     According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2021 ("2021 10-K"), that it filed with the SEC on March 1, 2022, Latch hardware customers can sign written but non-binding LOIs to purchase products and Latch includes these in its financial reports as Hardware Bookings. The 2021 10-K stated that "LOIs typically deliver within six to eighteen months of signing, depending on construction timelines." It explained that Bookings are adjusted to account for any adjustments made to Booked Home Units—Cumulative, including adjustments for those Bookings that do not ship within a 36-month construction timeframe.

28.     Confidential Witness 1 ("CW1") initially worked as a Channel Executive at Latch at the beginning of the Class Period and then became Regional Vice President of Channel Sales during the Class Period.

29.     According to CW1, before approximately March 2022, sales personnel were paid commission on LOIs for Hardware Bookings.

30.     Confidential Witness 2 ("CW2") was vice president of channel development at Latch during the Class Period. He first joined the Company in August 2018, initially as channel account manager, and also worked in the roles of general manager, Canada and senior director of channel development. CW2 reported to Chris Lee, then Latch's Chief Revenue Officer.

31.     According to CW2, he first heard about LOIs when he first joined Latch in 2018. As early as that time, Latch paid salespersons commission on LOIs. Latch management told CW2

at the time that the LOIs were an important tool to incentivize salespersons to promote the Latch brand and entice channel partners to sign up for non-binding commitments for future Hardware Bookings.

32.     Confidential Witness 3 ("CW3") was director of national channel partnerships and field sales at Latch from January 2018 until July 2019. CW3 reported to Scott Anderson, who was then Latch's vice president of sales. Later, from July 2021 until March 2022, CW3 was a Latch senior solutions engineer.

33.     According to CW3, he initially left Latch in July 2019 because he was uncomfortable with reporting LOIs as sales. He was instructed to secure LOIs and report them as sales on the premise that LOIs almost all converted into actual sales. That was not the case. Rather, in CW3's experience, only approximately 10% of LOIs ultimately converted into sales.

34.     According to CW1, superiors instructed them to secure LOIs as a way to make commissions. The text of the LOIs between Latch and channel partners expressed clearly that they were entirely non-binding. Their purpose was to protect the channel partner's pricing, but in no way whatsoever to confirm actual product sales. CW1 believed that the actual conversation rate of LOIs into purchase orders was only 15% to 25%. Nevertheless, throughout CW1's employment, from August 2021 until March/April 2022, Latch recognized revenue on LOIs before conversion into actual sales. From his sales territory alone, Latch recognized millions of dollars up front on LOIs.

35.     In another scheme to inflate revenue artificially, according to CW2, in 2022, when he was vice president of channel development, Latch sold hardware such as door locks to channel partners at, for example, $200. In turn, the channel partners sold the same lock to end users for $500. According to CW2, Latch recognized revenue for that sale at the channel partner's sale price

to the end-user, not the price the channel partner paid to Latch. For example, if Latch sold a lock to a channel partner for $200 and the channel partner sold it to the end user for $500, Latch would record $500 in revenue. CW2 told several employees in the CFO function that the Company could not recognize that revenue because it did not sell the product for that price, but the finance function employees rebuffed him, stating that Latch's recognition of a channel partner's sale price as its own sale price complied with accounting principles and policies.

36.    CW2 remembers that the channel partner program included a program called the Latch Preferred Partner Program, or LPP. Latch offered LPP to select channel partners who bought a large tranche of business, providing them with hardware to keep on the shelves to enable quick deliveries. In reality, however, the LPP program was a means of channel stuffing.[1] Latch shipped hardware around. Latch recognized the revenue from this hardware as soon as it was shipped to the channel partner. But when new orders came in, they began stopping channel partners from shipping from this inventory, instead placing new orders so that they could recognize more revenue, leaving the partners with shelves full of hardware.

37.    CW3 witnessed similar channel stuffing practices in 2018 and 2019. CW3 was routinely asked to find channel partners who would participate in channel stuffing. According to

---

[1] "Channel stuffing" refers to shipping to distributors more product than a Company believes it can can sell. Channel stuffing becomes a form of fraud when it is used to book revenues on the basis of goods shipped but not really sold because the buyer can return them. They are in effect sales on consignment, and such sales "cannot be booked as revenue. Neither condition of revenue recognition has been fulfilled—ownership and its attendant risks have not been transferred, and since the goods might not even be sold, there can be no certainty of getting paid. But those strictures haven't stopped some managers from using consigned goods to fatten the top line—that is, the revenue line—of the corporate income statement." H. David Sherman et al., *Profits You Can Trust, Spotting & Surviving Accounting Landmines* 30 (Financial Times Prentice Hall 2003). *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008).

CW3, Ali Hussain, Latch's Chief Operating Officer from 2015 to 2022, was the point person for this practice. As soon as a hardware product shipped to one of these channel partners, Latch would recognize the revenue. Latch offered incentives of extended payment terms and discounts to channel partners to take product delivery early, guaranteeing a buyback if the job for which the product was intended did not happen. CW3 saw a trend of channel partners buying products early under these terms and eventually shipping them back to Latch when they did not sell.

38.     In April or May 2019, CW3 met with Defendant Mitchell, Ali Hussain, and Scott Anderson, and told them that these business practices were not sustainable. Mitchell told CW3 directly that as a startup, Latch had to take risks in how it approached business. Unable to influence any changes, CW3 left the Company.

39.     CW3 returned to Latch in June 2021 as a senior solutions engineer. CW3 stated that prior to returning, he spoke with Chris Lee, then the Company's Chief Revenue Officer, who told him that Latch had cleaned up its business practices because it was going public. Lee told CW3 that the Company's auditors at Deloitte had reviewed its accounting. After returning, however, CW3 began to hear rumors about LPP. While he was not directly involved in LPP, CW3 observed that it felt very much like the channel stuffing he witnessed two years earlier. Often on sales planning calls, CW3 heard sales staff being urged to convince dealers to take delivery of products early.

40.     CW3 specifically recalled an ongoing relationship with a company called Whiz Cribs, a Chicago-based company, specializing in installation and support of smart products in multifamily buildings. This deal began in August or September 2019 and was still continuing when CW3 returned to Latch in June 2021. In exchange for a loan from Latch to Whiz Cribs, Whiz Cribs accepted large amounts of hardware inventory to hold. According to CW3, even as these were

consignment sales, Latch immediately recognized as revenue the hardware it sold product to Whiz Cribs. CW3 recalls that Defendant Mitchell was directly involved with the Whiz Cribs deal.

41.　Confidential Witness 4 ("CW4") was Latch's vice president of sales: North America from February 2020 until June 2022. Like CW2, CW4 reported to Chris Lee. CW4 also understands that Latch moved around product simply to recognize revenue. According to CW4, Latch stopped recognizing revenues on LOIs during the first quarter of 2022, the Company's management then scrambling to make up the difference through additional improper revenue recognition schemes.

42.　Like CW1, CW2, and CW3, CW4 witnessed improper revenue recognition schemes that were pervasive and ongoing during his tenure at Latch. CW4 knew that that Latch shipped hardware from its warehouse to a distribution warehouse it controlled, claiming it as revenue without any evidence of transfer to a bona fide buyer. CW4 understood that recognizing revenue without an ultimate purchaser is improper. Notwithstanding, according to CW4, Latch management routinely recognized revenues upon sending hardware to channel partner distribution warehouses even as the ultimate purchasers had yet to finalize purchase agreements with those channel partners. In fact, according to CW4, Latch offered channel partners material discounts to take the products and keep them on their warehouse shelves. In CW4's experience, only 60 to 70% of Latch's recognized North America revenue represented shipped product, and only 30 to 40% was actual, properly recognized revenue.

43.　Thus, according to witnesses with actual knowledge of Latch's hardware sales and revenue recognition process, senior Latch officers, themselves, orchestrated and knew of several different schemes and devices to premature recognize revenue for material hardware sales that Latch had not actually completed.

**B.    Defendants' Revenue Recognition Practices Violated GAAP and Latch's Accounting Policies Misleading Investors**

44.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. (ASC 105-10-05-1) Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

45.    The Company represented its financial position and results of operations in a manner which materially violated GAAP, including the following fundamental financial reporting principles and objectives:

The objective that financial reporting should provide financial information that is useful to existing and potential investors, lenders and other creditors in making investment, credit and similar decisions was violated (FASB Statement of Concepts ("CON") No. 8, ¶OB2);

The objective that financial reporting should provide information about the financial position of a reporting entity, which is information about the entity's economic resources and the claims against the reporting entity, and effects of transactions and other events that change a reporting entity's economic resources and claims was violated (CON 8, ¶OB12);

The objective that information about a reporting entity's financial performance should help financial statement users to understand the return the entity has produced on its economic resources was violated. Information about the return the entity has produced provides an indication of how well management has discharged its responsibilities to make efficient and effective use of the reporting entity's resources. Information about the variability and components of that return also is important, especially in assessing the uncertainty of future cash flows. Information

about a reporting entity's past financial performance and how its management discharged its responsibilities usually is helpful in predicting the entity's future returns on its economic resources. (CON 8, ¶OB16);

The principle that a reporting entity's accrual accounting should depict the effects of transactions, and other events and circumstances on a reporting entity's economic resources and claims in the periods in which those effects occur, even if the resulting cash receipts and payments occur in a different period, was violated. This is important because information about a reporting entity's economic resources and claims and changes in its economic resources and claims during a period provides a better basis for assessing the entity's past and future performance than information solely about cash receipts and payments during that period. Information about a reporting entity's financial performance during a period, reflected by changes in its economic resources and claims other than by obtaining additional resources directly from investors and creditors, is useful in assessing the entity's past and future ability to generate net cash inflows. That information indicates the extent to which the reporting entity has increased its available economic resources, and thus its capacity for generating net cash inflows through its operations rather than by obtaining additional resources directly from investors and creditors. (CON 8 ¶¶OB17 – OB18);

The principle that financial information should be useful, which means that it must be relevant and faithfully represent what it purports to represent, was violated. Relevance and faithful representation are fundamental qualitative characteristics of useful financial information. (CON 8, ¶¶QC4 – QC5);

The principle of relevance was violated in that material information of predictive or confirmatory value capable of making a difference in the decisions made by financial statement users was misrepresented (CON 8, ¶¶QC6 – QC7, QC11);

The principle of faithful representation was violated in that financial information was not complete, neutral, or free from error (CON 8, ¶QC12);

The principle of completeness, which means including all information necessary for a financial statement user to understand the phenomenon being depicted, was violated (CON 8, ¶QC13;

The principle of neutral depiction, meaning selection or presentation of financial information without bias, was violated. (CON 8, ¶QC14); and

The principle of faithful representation was violated due to errors and omissions in selecting and applying appropriate processes to produce the reported information and in its presentation (CON 8, ¶QC15); and

The revenue recognition principle that revenues are recognized when they are realized or realizable and earned was violated. (CON 5 ¶83; ASC 605-10-25-1). Revenue is generally realized and realizable when all of the following conditions are met: 1) persuasive evidence of an arrangement exists, 2) delivery has occurred

or services have been rendered, 3) the seller's price is fixed or determinable, and 4) collectability is reasonably assured. (ASC 605-10-S99-1, SAB Topic 13).

46.     In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, Revenue from Contracts with Customers (Accounting Standards Codification "ASC" Topic 606). This new standard replaced all previous accounting guidance on this topic and eliminated all industry-specific guidance. The new revenue recognition guidance provides a unified model to determine how revenue is recognized. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services.

47.     Revenue is one of the most important financial statement measures to users of financial statements. It is used to measure and assess aspects of a reporting entity's past financial performance, future prospects, and financial health.

48.     Latch adopted the current revenue recognition guidance effective January 1, 2018. Therefore, all revenue misstatements, which the Company has disclosed date back to 2019, occurred after the Company switched to the new revenue recognition guidance.

49.     Latch's disclosures of its accounting policy were consistent with ASC 606:



14

*In determining the appropriate amount of revenue to be recognized as it fulfills its obligations under its agreements, the Company performs the following steps: (i) identify contracts with customers; (ii) identify performance obligations; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations; and (v) recognize revenue when (or as) the Company satisfies each performance obligation.*

50.     At the beginning of the Class Period, Latch identified two sources of revenue: (1) hardware and other related revenue and (2) software revenue. Beginning in the second quarter of 2022, the Company began reporting services as a third revenue component. As shown below, Latch reported consistent year-over-year increases in revenue. Revenues reported for the period from Q2 2021 through Q1 2022 met or exceeded Latch's revenue guidance.



| (amounts in $000's) | FY 2019 12/31/2019 | Q1 2020 3/31/2020 | Q2 2020 6/30/2020 | Q3 2020 9/30/2020 | Q4 2020 12/31/2020 | FY 2020 12/31/2020 | Q1 2021 3/31/2021 | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | Q4 2021 12/31/2020 | FY 2021 12/31/2021 | Q1 2022 3/31/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hardware and other related revenue | $ 13,501 | $ 2,032 | $ 1,925 | $ 4,093 | $ 6,214 | $ 14,264 | $ 5,014 | $ 7,202 | $ 9,047 | $ 11,872 | $ 33,135 | $ 9,055 |
| Services | | | | | | | | | | | | 1,561 |
| Software revenue | 1,386 | 694 | 827 | 1,002 | 1,274 | 3,797 | 1,615 | 1,810 | 2,150 | 2,650 | 8,225 | 3,039 |
| Total revenue | $ 14,887 | $ 2,726 | $ 2,752 | $ 5,095 | $ 7,488 | $ 18,061 | $ 6,629 | $ 9,012 | $ 11,197 | $ 14,522 | $ 41,360 | $ 13,655 |
| Revenue Guidance (in millions) | | | | | | | $9 - $10 | $10 - $11 | $11.2 - $15.2 | $38 - $42 | | $12.7 - $14.8 |

51.     According to the 8-K that it filed on August 25, 2022, Latch's revenue misstatements most likely relate to revenue associated with the sale of hardware devices.

52.     For sales of hardware, the Company disclosed it sold to building developers through channel partners, who act as the intermediary and installer, and recognized hardware revenue when the hardware was shipped to channel partners, "which is when control is transferred to the building developer." This practice is consistent with GAAP, which provides:

> *An entity shall recognize revenue when (or as) the entity satisfies a performance obligation by transferring a promised good or service (that is, an asset) to a customer. An asset is transferred when (or as) the customer obtains control of that asset.*

ASC 606-10-25-23.

53.     The Company's recognizing revenue when transferring hardware products between warehouses, however, materially overstated revenue in violation of GAAP and Latch's own accounting policy, as there was no transfer of control.

54.     More, Latch's practice of recognizing revenue based on the price channel partners received from end users as opposed to the price it received from the channel partner indicates that it carried out sales on a consignment basis.

55.     Consignment sales occur when an entity ships goods to a distributor but retains control of the goods until a predetermined event occurs. GAAP prohibits Latch from recognizing revenue upon delivery of a product if the product is held on consignment. Under ASC 606-10-55-80, indicators that an arrangement is a consignment arrangement include, but are not limited to, the following:

> The product is controlled by the entity until a specified event occurs, such as the sale of the product to a customer of the dealer, or until a specified period expires.

> The entity is able to require the return of the product or transfer the product to a third party (such as another dealer).

> The dealer does not have an unconditional obligation to pay for the product (although it might be required to pay a deposit).

56.     GAAP bound Latch to recognize revenue only when it had ***transferred control*** of the goods to the distributor (in Latch's practice, a channel partner). A distributor may have physical possession of the goods, but might not control them in a consignment arrangement. For example, a distributor that is required to return goods to the manufacturer upon request might not have control over those goods. A consignment sale differs from a sale with a right of return. The customer has control of the goods in a sale with right of return and can decide whether to return the goods back to the seller. For example, according to CW3, Latch had a consignment arrangement with Whiz Cribs.

57.     Many entities offer their customers a right to return products they purchase. Return privileges can take many forms, including a right to return products for any reason, a right to return products if they become obsolete, a right to rotate stock, trade-in agreements for newer products, or a right to return products upon termination of an agreement. Some of these rights are explicit in a sales contract, while others are implied. These practices are generally driven by the buyer's desire to mitigate risk (risk of dissatisfaction, technological risk, or the risk that a distributor will not be able to sell the products) and the seller's desire to ensure customer satisfaction.

58.     A right of return is not a separate performance obligation, but it affects the estimated transaction price for transferred goods. GAAP only permitted Latch to recognize revenue for those goods that are not expected to be returned. The estimate of expected returns should be calculated in the same way as other variable consideration. The estimate should reflect the amount that the reporting entity expects to repay or credit customers, using either the expected value method or the most-likely amount method, whichever management determines will better predict the amount of consideration to which it will be entitled.

59.     Latch disclosed that, when recognizing revenue from hardware sales, it recorded reserves for **warranty** and **rights of return** for non-defective products granted in certain wholesale arrangements. While warranty obligation would exist on sales to all customers, unlimited rights of return most likely were granted only to significant customers. Warranty reserves reduce sales and increase cost of goods sold (i.e., no balance sheet impact), reserves for rights of return are recognized as a reduction of revenue and an allowance against accounts receivable. Therefore, it is possible to build up a reserve for wholesale returns and release it when needed to inflate revenues (i.e., a classic cookie jar reserve scheme). The Company disclosed that its accounts receivable are stated at net realizable value, net of allowance for doubtful accounts ***and*** reserve for wholesale returns.

| *(amounts in thousands)* | 12/31/2019 | 12/31/2020 | 3/31/2021 | 6/30/2021 | 9/30/2021 | 12/31/2021 | 3/31/2022 |
|---|---|---|---|---|---|---|---|
| A/R from related parties | 487 | 1,372 | 721 | 800 | 400 | 500 | 100 |
| A/R (significant customers) | 2,534 | 1,532 | 1,595 | - | 2,500 | 3,000 | 5,000 |
| Gross A/R | 8,793 | 10,102 | 11,199 | 12,743 | 20,048 | 28,222 | 32,419 |
| Reserve for wholesale returns (A/R) | (1,483) | (1,787) | (1,775) | (400) | (600) | (600) | (600) |
| Allowance for doubtful accounts | (283) | (88) | (259) | (200) | (800) | (1,980) | (2,852) |
| Net A/R | 7,027 | 8,227 | 9,165 | 12,143 | 18,648 | 25,642 | 28,967 |

60.     As the above chart shows, prior to going public, Latch's reserve for wholesale returns ranged from $1.5 million at the end of 2019 to $1.8 million at the end of 2020 and Q1 2021. The Company barely met its revenue guidance in Q2 2022 and the reserve declined to only $400,000 at the end of Q2 2022.

61.     Significant customers likely represented the wholesale relationships for which the Company purportedly granted unlimited rights of return. The following table shows that the revenue from significant customers (which could include improperly recognized consignment sales) was sufficient to enable the Company to meet its revenue guidance, even when netted with reported reserves for wholesale returns:

| (amounts in $000's) | Q2 2021 6/30/2021 | | Q3 2021 9/30/2021 | | FY 2021 12/31/2021 | | Q1 2022 3/31/2022 | |
|---|---|---|---|---|---|---|---|---|
| Revenue (significant customers) | $ | 2,000 | $ | 1,800 | $ | 4,900 | $ | 4,400 |
| Reserve for wholesale returns (revenue) | $ | (400) | $ | 300 | $ | 100 | $ | - |
| | $ | 1,600 | $ | 2,100 | $ | 5,000 | $ | 4,400 |
| *% of total net revenue* | | *17.8%* | | *18.8%* | | *12.1%* | | *32.2%* |
| Total reported revenue | $ | 9,012 | $ | 11,197 | $ | 41,360 | $ | 13,655 |
| Excess of reported revenue over the lower end of the range of Company's guidance | $ | 12 | $ | 1,197 | $ | 3,360 | $ | 955 |

62.     Latch's systemic improper recognition of revenue materially impacted its financial statements during the Class Period.

63.     ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes, and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." (ASC 250-10-20 – Glossary).

64.     The Company's disclosures show that it had discovered a multi-period error:

As previously disclosed, based on the findings of the Investigation, the Audit Committee, after discussion with management, determined that the Company's consolidated financial statements for 2019, 2020, 2021 and the first quarter of 2022 (all such interim and annual periods, the "Affected Periods") should no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue. Accordingly, the Audit Committee, in consultation with the Company's management, determined that the Company's consolidated financial statements for the Affected Periods will be restated. Any previously issued or filed reports, registration statements, proxy statements, prospectuses, press releases, earnings releases, investor presentations

or other communications including, describing or incorporating by reference the Company's consolidated financial statements and other related financial information covering the Affected Periods should no longer be relied upon. *See* April 3, 2023 Form NT 10-K and May 16, 2023 Form NT 10-Q.

65.     ASC 250 states that if a company must correct a prior period error, it should do so

by restating the prior-period financial statements including the following:

*The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.*

*An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.*

*Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.*

*(*ASC 250-10-45-23).

66.     ASC 250 further requires disclosure that "previously issued financial statements

have been restated, along with a description of the nature of the error", including "the effect of the

correction on each financial statement line item… for each prior period presented" and "the

cumulative effect of the change on retained earnings …as of the beginning of the earliest period

presented." (ASC 250-10-50-7).

67.     In addition, Item 4.02 of Form 8-K requires specific disclosures when "the

registrant's board of directors …concludes that any previously issued financial statements

…should no longer be relied upon because of an error in such financial statements." The Company

made these required disclosures in its August 25, 2022 Form 8-K, November 10, 2022 Form NT

10-Q, and in April 3, 2023 Form NT 10-K.

68.     Such disclosure of "non reliance on previously issued financial statements" is

associated with what is colloquially called by the accounting profession a "Big R restatement." A

Big R restatement occurs when the error is *material* to the prior period financial statements. When

the error is material, the entity is required to alert the users of these financial statements that they, and the related auditor's report, can no longer be relied upon. Conversely, when an error is *immaterial* to prior period financial statements, a "little r restatement" occurs. A little r restatement becomes necessary when failing to correct a prior period's immaterial error, or correcting it through current year's income statement, would be material to the current year's financial statements. In a little r restatement, the prior period adjustments are made in the current filing, but the entity is not required to alert users of the prior period financial statements (since the error is immaterial in those periods and they can continue to be relied upon). It is also not required to restate previously published quarterly information, or provide the same detailed disclosures of the nature of the error, because GAAP does not apply to immaterial items. (ASC 105-10-05-6).

69.    FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting, including the concept of materiality. As FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8") states, the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is ***useful*** to existing and potential investors, lenders, and other creditors ***in making decisions*** about providing resources to the entity" (CON 8 ¶ OB2, emphasis added). A primary quality that renders financial information useful is faithful representation. For an entity to faithfully represent what it purports to represent, information must be complete, neutral, and ***free from error*** (CON 8 ¶ QC12, emphasis added). CON 8 further explains that materiality is entity specific: *"**The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item**."* (Emphasis added.) (CON 8 ¶ QC11).

70.     SEC Staff Accounting Bulletin ("SAB") Topics 1.M and 1.N (formerly referred to as SAB Nos. 99 and 108, respectively) provides further guidance on materiality. SAB Topic 1.M offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. It brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. Topic 1.M addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. It provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material. "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

71.     In summary, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. By announcing that a restatement is necessary, the Company admitted that the errors in its financial statements were material to its 2019 – Q2 2022 financial statements.

**C.     False and Misleading Statements During the Class Period**

72.     The Class Period begins on May 13, 2021, when the Company filed its Proxy soliciting stockholder approval of the Business Combination.

73.     The Proxy provided historical financial statements for Latch for 2019 and 2020. These indicated that Latch had $14.887 million in total revenue and $50.226 million in net loss for 2019, and $18.061 million in total revenue and $65.994 million in net loss for 2020. About "Key Business Metrics, the Proxy included the following chart:

| (In thousands) | 2020 | 2019 | $ Change | % Change |
|---|---|---|---|---|
| **U.S. GAAP Measures:** | | | | |
| Revenue | $ 18,061 | $ 14,887 | $   3,174 | 21% |
| Net Loss | $(65,994) | $(50,226) | $(15,768) | (31)% |
| **Key Performance Indicators:** | | | | |
| Hardware Bookings | $ 72,511 | $ 40,800 | $ 31,711 | 78% |
| Software Bookings | $ 92,454 | $ 69,809 | $ 22,645 | 32% |
| Total Bookings | $164,965 | $110,609 | $ 54,356 | 49% |
| Booked ARR | $ 31,134 | $ 14,486 | $ 16,648 | 115% |
| Booked Home Units—Cumulative | 304,749 | 144,699 | 160,050 | 111% |
| Adjusted EBITDA | $(54,842) | $(44,930) | $  (9,912) | (22)% |

74.     The foregoing disclosure of Latch's revenue and net loss for 2019 and 2020 was materially false and misleading. In violation of GAAP, Defendants knowingly or recklessly disregarded Latch had improperly recognized revenue. As a result, its revenue figures for 2019 and 2020 were materially false. More, Defendants omitted that the Company lacked internal controls over financial reporting specifically due to its practice of recognizing revenue on LOIs and on hardware that was moved to channel partners' facilities without an actual change in control, and on the basis of on incorrect sales prices.

75.     On June 9, 2021, Latch announced its first quarter 2021 financial results in a press release, disclosing that Latch had achieved $6.6 million in revenue and had net loss of $38 million. In that release, Defendant Schoenfelder touted the Company's "strong start to the year, highlighted by a sharp acceleration in Total Bookings and revenue growth[.]"

76.     This foregoing disclosure of Latch's revenue and net loss for the first quarter of 2021, ended March 31, 2021, was materially false and misleading because Defendants knew and/or

recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue growth as reflected in the results that it provided.

77.     On August 12, 2021, Latch announced its second quarter 2021 financial results in a press release, disclosing that Latch had achieved $9.0 million in revenue and had net loss of $40 million. In that release, Defendant Schoenfelder touted "powerful demand for our products that drove a sharp acceleration in Total Bookings and revenue growth in the first half of the year[.]"

78.     This foregoing disclosure of Latch's revenue and net loss for the second quarter of 2021, ended June 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue growth as reflected in the results that it provided.

79.     On August 13, 2021, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2021, repeating the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses. The report was signed by Defendants Schoenfelder and Mitchell. Appended as Exhibits were signed SOX certifications from Defendants Schoenfelder and Mitchell, attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

80.     This foregoing disclosure of Latch's revenue and net loss for the second quarter of 2021, ended June 30, 2021, was materially false and misleading because Defendants knew and/or

recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendants omitted that the Company lacked internal controls over financial reporting specifically due to its practice of recognizing revenue on LOIs and on hardware that was moved to channel partners' facilities without an actual change in control, and on the basis of on incorrect sales prices.

81.     On November 9, 2021, Latch announced its third quarter 2021 financial results in a press release, disclosing that Latch had achieved $11.2 million in revenue and had net loss of $34.2 million. In that release, Defendant Schoenfelder touted the Company's revenue, describing the quarter as "another record quarter for Latch, with 120% revenue growth year-over-year."

82.     This foregoing disclosure of Latch's revenue and net loss for the third quarter of 2021, ended September 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue growth as reflected in the results that it provided.

83.     On November 10, 2021, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021, repeating the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses. The report was signed by Defendants Schoenfelder and Mitchell. Appended as Exhibits were signed SOX certifications from Defendants Schoenfelder and Mitchell, attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

84.     This foregoing disclosure of Latch's revenue and net loss for the third quarter of 2021, ended September 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendants omitted that the Company lacked internal controls over financial reporting specifically due to its practice of recognizing revenue on LOIs and on hardware that was moved to channel partners' facilities without an actual change in control, and on the basis of on incorrect sales prices.

85.     On February 24, 2022, Latch announced its fourth quarter and full year 2021 financial results in a press release, disclosing that Latch had achieved $14.5 million in revenue with $53.9 million in net loss during the previous quarter and $41.4 million in net revenue with $166.3 million in net loss for the previous year. In that release, Defendant Schoenfelder touted the Company's revenue, stating "It was another strong quarter for Latch, wrapping up a big 2021 for our team. Not only did we take the company public earlier in the year, but we also experienced really strong growth, resulting in a 129% increase in total revenue."

86.     This foregoing disclosure of Latch's revenue and net loss for the fourth quarter and full year of 2021, ended December 31, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue growth as reflected in the results that it provided.

87.     On March 1, 2022, Latch filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), repeating the previously reported financial results. The report was signed by Defendant Schoenfelder and Mitchell. Appended as Exhibits were signed

SOX certifications from Defendants Schoenfelder and Mitchell, attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

88.     This disclosure of Latch's revenue and net loss for the full year of 2021, ended December 31, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue. More, Defendants omitted that the Company lacked internal controls over financial reporting specifically due to its practice of recognizing revenue on LOIs and on hardware that was moved to channel partners' facilities without an actual change in control, and on the basis of on incorrect sales prices.

89.     Regarding the Company's revenue recognition policy for hardware, the 2021 10-K stated, in relevant part:

> *Hardware and Other Related Revenue*
>
> We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart apartment solutions. We sell hardware to building developers directly or through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped directly to building developers or to our channel partners, which is when control is transferred to the building developer.

90.     This disclosure was materially false and misleading because Defendants knew and/or disregarded that they were not, in fact, recognizing hardware revenue when control of it transferred. Rather, the Company was routinely recognizing revenue on LOIs and on hardware that was moved to channel partners' facilities without an actual change in control, and on the basis of incorrect sales prices.

91.     On May 5, 2022, Latch announced its first quarter 2022 financial results in a press release, disclosing that Latch had achieved $13.7 million in revenue with $44.2 million in net loss during the previous quarter.

92.     This foregoing disclosure of Latch's revenue and net loss for the first quarter of 2022, ended March 31, 2022, was materially false and misleading because Defendants knew and/or recklessly disregarded that it was based on improperly recognized revenue and therefore materially overstated Latch's revenue.

93.     Also on March 5, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022, repeating the previously reported financial results. The report also stated that the previously disclosed material weakness in its internal control over financial reporting had not been remediated. With respect to its revenue recognition policy, Latch stated, in relevant part:

> The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions. The Company sells hardware to building developers directly or through its channel partners who act as the intermediary and installer. The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer.

> The report was signed by Defendant Schoenfelder and Schaeffer. Appended as Exhibits were signed SOX certifications from Defendants Schoenfelder and Schaeffer, attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

94.     This disclosure was materially false and misleading because Defendants knew and/or recklessly disregarded that the previously reported financial results materially overstated Latch's revenue. It was also materially false and misleading because Defendants knew and/or recklessly disregarded that it omitted that the Company lacked internal controls over financial reporting specifically due to its practice of recognizing revenue on LOIs and on hardware that was

moved to channel partners' facilities without an actual change in control, and on the basis of on

incorrect sales prices. It was also materially false and misleading because Defendants knew and/or

recklessly disregarded that it materially misstated Latch's actual revenue recognition practices. In

fact, the Company was routinely recognizing revenue on LOIs and on hardware that was moved

to channel partners' facilities without an actual change in control, and on the basis of on incorrect

sales prices.

### D.    The Truth Emerges

95.    On August 10, 2022, Latch filed a notification of late filing with the SEC on Form

12b-25, stating that it could not file its quarterly report on Form 10-Q for the quarter ended June

30, 2022 because the Audit Committee of the Company's Board of Directors had commenced an

investigation of alleged current and prior period matters, including Latch's revenue recognition

practices.

96.    On August 25, 2022, after the market closed, Latch revealed that it would restate

its financial statements for 2021 and the first quarter of 2022 due to revenue recognition errors

related to the sale of hardware devices. In an 8-K, the Company stated:

> [B]ased on the preliminary findings of the Investigation, the Audit Committee
> determined that the Company's consolidated financial statements for 2021 included
> in the Company's Annual Report on Form 10-K for the year ended December 31,
> 2021 and associated report of the Company's independent registered public
> accounting firm, Deloitte & Touche LLP ("Deloitte"), as well as the Company's
> consolidated financial statements for the first quarter of 2022 included in the
> Company's Quarterly Report on Form 10-Q for the three months ended March 31,
> 2022, should no longer be relied upon as a result of material errors and possible
> irregularities relating to, among other things, the manner in which the Company
> recognized revenue associated with the sale of hardware devices during 2021 and
> the first quarter of 2022. Accordingly, the Audit Committee, in consultation with
> the Company's management, has determined that the Company's consolidated
> financial statements for 2021 and the first quarter of 2022 will be restated.
>
> Based on the preliminary findings of the Investigation, certain revenue recognition
> errors occurred as a result of unreported sales arrangements due to sales activity
> that was inconsistent with the Company's internal controls and procedures. The

Company's management is assessing the effect of the matters identified to date and the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures. Although the assessment is not yet complete, the review is likely to result in one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods.

97.     On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

### E.     Latch Terminates Executives, Loses its NASDAQ Listing, and Fails to Timely Restate Its Results

98.     In a Form NT 10-Q filed with the SEC on November 10, 2022, Latch stated that it could not file its quarterly report on Form 10-Q for the quarter ended September 30, 2022 because its Audit Committee's investigation remained ongoing. Latch additionally disclosed that the investigation had been expanded to include an investigation of the Company's financial statements for 2019 and 2020, as additional errors had been identified for those time periods. The filing stated that based on the preliminary findings of the investigation, "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures.

99.     On November 16, 2022, Latch filed an 8-K with the SEC stating that on November 14, 2022 it received a notice from the Nasdaq Listing Qualifications Department, notifying the Company that it was not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) as a result of its failure to file its quarterly report on Form 10-Q for the quarter ended September 30, 2022. Following Latch's failure to file its quarterly report on Form 10-Q for the quarter ended June 30, 2022 previously, it had submitted a plan to regain compliance with the Rule, and Nasdaq granted an exception for the Company to regain

compliance by filing the Quarterly Reports by February 6, 2023. This notice gave Latch until November 28, 2022 to submit an update to this compliance plan.

100.   On January 11, 2023, Latch announced the resignation of Defendant Schoenfelder as the Company's CEO and Chairman of the Board. The Board appointed Jason Keyes as interim CEO. Also on January 11, 2023, Defendant Schaefer resigned as Latch's Interim CFO.[2]

101.   On January 18, 2023, Latch disclosed in an 8-K that on January 11, 2023, it had received a written notice from the Nasdaq Listing Qualifications Department, notifying the Company that based on the closing bid price for the Company's common stock for the previous 30 consecutive trading days, Latch no longer met the minimum closing bid price requirement for continued listing on the Nasdaq Global Select Market. The Company would have a 180 day period to regain compliance, with the requirement that its stock trade at minimally $1 per share for a minimum of ten consecutive trading days prior to July 10, 2023.

102.   On January 23, 2023, Latch disclosed in an 8-K filed with the SEC, stating that based on the findings of its internal investigation, the Audit Committee had determined that, in addition to the Company's consolidated financial statements for 2021 and the first quarter of 2022, the consolidated financial statements for 2019 and 2020 should also no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue. Latch stated that the investigation was now substantially complete, and that its management and Audit Committee had initiated a remediation process. The 8-K stated that the errors and issues included errors in the recognition of revenue for sales to various customers resulting primarily from (1) a failure of certain sales personnel in certain cases to disclose relevant

---

[2] Schaeffer himself had replaced Defendant Mitchell upon Mitchell's termination on March 29, 2022.

terms they had negotiated with customers and a failure to identify, consider and properly account for such terms, (2) a failure to consider fully the impact of certain terms of sales agreements with customers in determining the amount and timing of revenue to be recognized and (3) a failure to adequately assess collectability. The Investigation also identified errors in certain key performance indicators, including "bookings" and related metrics.

103.   On February 13, 2023, Latch disclosed in an 8-K that on February 7, 2023, it had received a Staff Delisting Determination from the Listing Qualifications Department of Nasdaq notifying the Company that Nasdaq had initiated a process that could result in the delisting of Latch's securities from Nasdaq as a result of the Company not being in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC. Latch stated that it intended to appeal and seek a further stay of any suspension or delisting action. On February 28, 2023, the Nasdaq Hearings Panel notified Latch that it was granting its request to extend the automatic stay of suspension from Nasdaq pending a hearing schedule for March 23, 2023.

104.   On April 3, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2022.

105.   On April 11, 2023, Latch disclosed that it had received another notice from Nasdaq that it was not in compliance with the Listings Rule.

106.   On May 16, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2023.

107.    On July 31, 2023, Latch filed an 8-K disclosing that on that day, it had notified the Nasdaq hearings panel that the Company did not anticipate filing the financial reports that it had failed to file to regain compliance with Nasdaq Listing Rule 5250(c)(1) on or before August 4, 2023, which was its deadline. Accordingly, as Latch disclosed in an August 8, 2023, 8-K, on August 8, the Company received a notice from the Panel stating that it has determined to suspend trading of the Company's securities on August 10, 2023 and commence delisting procedures.

108.    On August 15, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its quarterly report on Form 10-Q for the quarterly period ended June 30, 2023.

109.    Latch has not told investors when to expect its restated financial results, or the disclosure of any new financial results.

## V.    PLAINTIFF'S CLASS ACTION ALLEGATIONS

110.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of Latch during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

111.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may

be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

112.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

113.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

114.    Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a.    whether Defendants' acts as alleged violated the federal securities laws;

b.    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.    whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.      whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

115.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.     APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

116.    Plaintiff will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Latch's common stock was open, well-developed, and efficient. As a result of the materially false and/or misleading statements and/or failures to disclose, Latch's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Latch's common stock and market information relating to Latch, and have been damaged thereby.

117.    During the Class Period, the artificial inflation of Latch's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Latch's business, operations, and revenue. These material misstatements and/or omissions created an unrealistically positive assessment of Latch and its

business, operations, and revenue, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

118.    At all relevant times, the market for Latch's common stock was an efficient market for the following reasons, among others:

a.    Latch common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b.    As a regulated issuer, Latch filed periodic public reports with the SEC and/or the Nasdaq;

c.    Latch regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.    Latch was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

119.     As a result of the foregoing, the market for Latch's common stock promptly digested current information regarding Latch from all publicly available sources and reflected such information in Latch's stock price. Under these circumstances, all purchasers of Latch's common stock during the Class Period suffered similar injury through their purchase of Latch's common stock at artificially inflated prices and a presumption of reliance applies.

120.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial results and prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.   COUNTS

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

121.     Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

122.     This Count is asserted against each of the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

123.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Latch's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

124.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Latch's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

125.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Latch's business operations and financial results and prospects, as specified herein.

126.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Latch's revenue, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Latch and its business operations and financial results and prospects in light of the circumstances under which they were

made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

127.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's revenue recognition practices, financial results, and reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

128.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Latch's actual business operation practices and revenues from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's revenues and business operations throughout the Class Period, Defendants, if they did not have actual

knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

129.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Latch's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Latch's common stock during the Class Period at artificially high prices and were damaged thereby.

130.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Latch's revenue recognition practices and its overstatement of revenue in its financial reports, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Latch common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

131.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

132.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

133.     The Individual Defendants acted as controlling persons of Latch within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their participation in and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

134.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the revenue recognition practices giving rise to the securities violations as alleged herein, and exercised the same.

135.     As set forth above, Latch and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

other members of the Class suffered damages in connection with their purchases of the Company's

common stock during the Class Period.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of

the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of

the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment

interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## IX.     DEMAND FOR TRIAL BY JURY

136.    Plaintiff hereby demands a trial by jury.

Dated: October 20, 2023                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
        lheifetz@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*