**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SLATER BRENNAN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>LATCH, INC. f/k/a TS INNOVATION ACQUISITIONS CORP., LUKE SCHOENFELDER, GARTH MITCHELL, and BARRY SCHAEFFER,<br><br>    Defendants. | Case No. 1:22-cv-07473-JGK<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ..........................................................................1

II.   JURISDICTION AND VENUE ....................................................................5

III.  PARTIES ........................................................................................................5

IV.   SUBSTANTIVE ALLEGATIONS ...............................................................6

  A.   Latch Misrepresented Key Business Metrics to Investors ...................6

    1.   Background ....................................................................................6

    2.   Revenue and Bookings Are Each Key Business Metrics, and
         Material to Latch Investors ........................................................8

    3.   Former Latch Employees Detail How Latch Misreported
         Both GAAP and Non-GAAP Key Business Metrics...............11

      a)   Latch Misrepresented Hardware Bookings as a
           Metric by Misrepresenting the Conversion of
           LOIs Into Sales .................................................................11

      b)   Latch Misrepresented Revenue .....................................12

      c)   Latch Engaged in Channel Stuffing and Unreported
           Consignment Sales .........................................................15

    4.   Describing the Audit Committee Investigation, Latch
         Concedes Its Management Engaged in Intentional
         Misconduct..................................................................................18

  B.   Defendants' Revenue Recognition Practices Violated GAAP
       and SEC Regulations and Misled Investors .......................................19

    1.   Channel Stuffing ........................................................................21

    2.   Disclosure of Known Trends ....................................................24

    3.   Accounting for Consignment Sales .........................................25

    4.   Required Disclosures .................................................................26

C.      Non-GAAP Financial Measures...........................................................28

D.      Restatement and Materiality...............................................................29

E.      Defendants' Internal Control Obligations...........................................33

F.      False and Misleading Statements During the Class Period ................36

G.      The Truth Emerges but Defendants Continue to Mislead..................46

V.      PLAINTIFF'S CLASS ACTION ALLEGATIONS .....................................53

VI.     APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD
        ON THE MARKET ....................................................................................55

VII.    COUNTS ...................................................................................................57

VIII.   PRAYER FOR RELIEF ..............................................................................62

IX.     DEMAND FOR TRIAL BY JURY ............................................................62

1.      Lead Plaintiff VP PTC Establishment as Trustee of Gersec Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Latch, Inc. ("Latch" or "Company"), analysts' reports and advisories about the Company, consultations with accounting experts, interviews with former Company employees, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

2.      This is a federal securities class action on behalf of persons and entities that purchased or otherwise acquired Latch common stock between June 7, 2021, and August 1, 2023, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act").

3.      On August 10, 2022, Latch, an enterprise technology company, purportedly offering a full-building operating system, disclosed on Form 12b-25 that it was unable to file with the United States Securities and Exchange Commission ("SEC") its quarterly report on Form 10-Q. The Company's Audit Committee disclosed that it "has commenced an investigation (the "Investigation") of alleged current and prior period matters that include, but may not be limited to, certain aspects of the Company's current and historic key performance indicators and revenue

1

recognition practices, including the accounting treatment, financial reporting and internal controls related thereto."

4.      On August 12, 2022, after the market closed, the Company warned that its failure to file its Quarterly Report on Form 10-Q for the second quarter jeopardized its Nasdaq listing. On August 25, 2022, after the market closed, Latch revealed that its financial statements for 2021 and the first quarter of 2022 were materially false. The Company warned that the Audit Committee's preliminary findings demonstrated that investors, creditors, and others should no longer rely upon those financial statements "as a result of material errors and possible irregularities relating to, among other things, the manner in which the Company recognized revenue associated with the sale of hardware devices during 2021 and the first quarter of 2022." Latch determined to restate those financial statements, the financials it used to secure a "Business Combination" with TS Innovation Acquisition Corp. ("TSIA"), a special purpose acquisition corporation. Through the business combination that Defendants accomplished, in material part using, materially false financial statements and "Key Business Metrics," Latch secured cash of "between approximately $150 million, assuming maximum shareholder redemptions permitted under the Merger Agreement, and $450 million, assuming no shareholder redemptions."

5.      On August 25, 2022, the Company also stated that "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures."

6.      On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022, on unusually heavy trading volume.

7.      On May 16, 2023, Latch filed with the SEC a Form 12b-25, warning further that investors should not rely on any of the Company's financial statements for 2019 and 2020 and

promising a restatement of those financial statements, interim and annual, in addition to financial statements for 2021 and the first quarter of 2022. The issues relating to those earlier financial statements were the same, "result[ing from] internal control deficiencies and errors relating to the manner in which the Company recognized revenue."

8.      As of the date of this Complaint, even as Latch announced the preliminary results of its Investigation in short order—requiring restatement of materially false financials—Latch has neither restated over 3 years of materially false financials nor disclosed the results of its Audit Committee's Investigation into irregularities—intentional false statements by management. Latch publicly stated that it would restate its financials by August 4, 2023, well after stating on January 23, 2023, that its Audit Committee's Investigation was substantially complete. On August 4, 2023, Latch disclosed that it would not restate on August 4, 2023, without any more substantive update. Neither has Latch filed any subsequent financial statement for the more than five quarters since announcing that 3 years of its periodic financial statements were materially false.

9.      On August 9, 2023, Latch disclosed that the Nasdaq Stock Market LLC ("Nasdaq") would "suspend trading of the company's securities on August 10, 2023, and commence delisting procedures because of the company's failure to meet the August 4, 2023 deadline to regain compliance with its periodic filing obligations." A year after first disclosing the material falsity of its financial statements, "[t]he company was unable to meet the deadline due to unexpected delays in the ongoing restatement of its historical financial statements."

10.      According to former employees, from the time of Latch's Business Combination with TSIA, making Latch a public company, it issued materially false and misleading financial statements, audited and unaudited, and released materially false and misleading Key Business Metrics, what Defendants disclosed as the Company's most important GAAP and non-GAAP

performance indicators. During the Class Period, with knowledge or severely reckless disregard, Defendants reported materially overstated hardware revenue figures and misled investors concerning Hardware Bookings and Total Bookings in Latch's periodic financial statements.

11.     Defendants concealed that from 2019 through the first quarter of 2022, Latch materially misstated revenue—a Key Business Metric for a company that was ex-profit—in violation of GAAP as well as its own accounting policies, improperly recognizing revenue (a) based on shipments of hardware to warehouses owned by its channel partners who had no current need for the product and/or ability to sell it in a reasonable time period without recognizing appropriate allowance for future product returns; (b) by recording sales at fictitious and/or inflated sales prices; and (c) improperly recognizing revenues in consignment sales arrangements upon product shipment. More, Latch failed to disclose the impact its revenue recognition practices would have on its revenue and income from continuing operations trend.

12.     In addition, through the fourth quarter of 2021, Latch materially misled investors about its future revenue prospects, reporting Hardware and Total Bookings, non-GAAP Key Business Metrics based on Letters of Intent ("LOIs") that were simply agreements locking in prices for potential customers, but not valid indicators of future sales, without adjusting the future sales "commitments" for future discounts. These measures, which provided information about the Company's historic and prospective revenues, were particularly critical for Latch, an early-stage company with a history of losses and no immediate prospects of profitability, as it noted in its May 13, 2021, prospectus / proxy statement on Form 424b3 ("Prospectus").

13.     As the direct and proximate result of Defendants' knowing or reckless wrongdoing, Plaintiff and other Class members suffered damages.

## II.     JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as the alleged misstatements entered the securities markets from this District and the subsequent damages took place in this District. Latch's primary executive offices are located in this District.

17.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of the national securities exchange.

## III.     PARTIES

18.     Lead Plaintiff, VP PTC Establishment as Trustee of Gersec Trust, as set forth in its previously filed PSLRA Certification (Dkt. No. 22-2), acquired Latch common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of Defendants' fraud.

19.     Defendant Latch is a Delaware corporation with its principal executive offices located in New York, New York. During the Class Period, Latch's common stock traded on the NASDAQ exchange under the symbol "LTCH," and its warrants traded on the NASDAQ exchange under the symbol "LTCHW."

20.     Defendant Luke Schoenfelder ("Schoenfelder") was Latch's Chief Executive Officer ("CEO") until January 11, 2023.

21.     Defendant Garth Mitchell ("Mitchell") was Latch's Chief Financial Officer ("CFO") until March 28, 2022.

22.     Defendant Barry Schaeffer ("Schaeffer") served as Latch's Interim CFO from March 28, 2022, until January 11, 2023.

23.     Defendants Schoenfelder, Mitchell, and Schaeffer (together, "Individual Defendants") each:

a.  directly participated in the management of the Company;

b.  was directly involved in the day-to-day operations of the Company at the highest levels;

c.  was privy to confidential proprietary information concerning the Company and its business and operations;

d.  was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e.  was directly or indirectly involved in the oversight or implementation of the Company's internal controls

f.  was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company;

g.  approved or ratified these statements in violation of the federal securities laws; and

h.  signed false SOX certifications.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.     Latch Misrepresented Key Business Metrics to Investors

#### 1.       Background

24.     Launched by Tishman Speyer Properties, L.P. ("Tishman Speyer"), TSIA was a publicly traded special purpose acquisition company ("SPAC"). On May 13, 2021, TSIA filed with the SEC a proxy statement/prospectus ("Prospectus"), detailing its "Business Combination"

with Latch and informing TSIA shareholders of a June 3, 2021, vote to approve the Business Combination. As such, on June 4, 2021, Latch became a public company through the Business Combination with TSIA.

25.     Founded in 2014, Latch claims to be "revolutionizing the way people experience spaces by making spaces better places to live, work, and visit." It claims to have "created a full-building operating system, LatchOS, that addresses the essential needs of modern buildings by streamlining building operations, enhancing the resident experience, and enabling more efficient interactions with service providers." Latch claims to "generate[] software revenue primarily through the sale of our software-as-a-service, or SaaS, over our cloud-based platform on a subscription-based arrangement. Subscription fees vary depending on the optional features selected by customers as well as the term length."

26.     Our product offerings," the Company continued, "designed to optimize the resident experience, include smart access, delivery and guest management, smart home and sensors, connectivity and personalization and services." Latch, Defendants continued, "combine[s] hardware, software and services into a holistic system that makes spaces more enjoyable for residents, more efficient and profitable for building operators and more convenient for service providers."

27.     Latch's claims about revolutionizing the building operating system, however, were mainly aspirational. Even as it may develop and sell building operations software that may accompany hardware installations, Latch is principally a hardware company, selling "door-mounted access control products" and "intercom systems."

### 2. Revenue and Bookings Are Each Key Business Metrics, and Material to Latch Investors

28.     According to the Prospectus, prior to the Business Combination, as a private company, Latch had never been profitable. For example, in 2019, Latch reported a net loss of over $50 million on revenue of $14.9 million. Similarly, in 2020, Latch reported a net loss of $66 million on revenue of $18 million. As a result, investors measure Latch's progress towards profitability by reference to revenue. In addition, Latch has given investors a glimpse into future revenues by reporting bookings. Accordingly, these metrics are material to investors in making investing decisions concerning the Company.

29.     The Prospectus stated that among the Company's key business metrics were GAAP measures, principally revenue as the Company had reported consistent net losses throughout its history, and non-GAAP key performance indicators, including hardware bookings, software bookings, and total bookings:

**Key Business Metrics**

We review the following key business metrics to measure our performance, identify trends affecting our business, formulate business plans, and make strategic decisions which will impact the future operational results of the Company. Increases or decreases in our key business metrics may not correspond with increases or decreases in our revenue.

The limitations our Key Business Metrics have as an analytical tool are: (1) they might not accurately predict our future GAAP financial results (2) we might not realize all or any part of the anticipated contract value reflected in our backlog, and (3) other companies, including companies in our industry, may calculate our Key Business Metrics or similarly titled measures differently, which reduces its usefulness as a comparative measure.

| (In thousands) | 2020 | 2019 | $ Change | % Change |
|---|---|---|---|---|
| **U.S. GAAP Measures:** | | | | |
| Revenue | $ 18,061 | $ 14,887 | $ 3,174 | 21% |
| Net Loss | $(65,994) | $(50,226) | $(15,768) | (31)% |
| **Key Performance Indicators:** | | | | |
| Hardware Bookings | $ 72,511 | $ 40,800 | $ 31,711 | 78% |
| Software Bookings | $ 92,454 | $ 69,809 | $ 22,645 | 32% |
| Total Bookings | $164,965 | $110,609 | $ 54,356 | 49% |

8

| | | | |
|---|---|---|---|
| Booked ARR | $ 31,134 | $ 14,486 | $ 16,648 | 115% |
| Booked Home Units—Cumulative | 304,749 | 144,699 | 160,050 | 111% |
| Adjusted EBITDA | $(54,842) | $(44,930) | $ (9,912) | (22)% |

*See* Prospectus at 148.

30.     Latch sold and sells hardware through its channel partners. In the Prospectus, Latch explained that "[w]e sell hardware to building developers through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer."

31.     About revenue recognition generally and Hardware revenue recognition specifically, the Prospectus states:

*Revenue Recognition*

We currently generate revenue primarily from two sources, hardware devices and software products. Revenue is recognized upon transfer of control of promised goods or services to customers at transaction price. The Company estimates the transaction price, including variable consideration, at the commencement of the contract and recognizes revenue over the contract term.

To determine the transaction price, we analyze all of the performance obligations included in the contract. We consider the terms of the contract and our customary business practices, which typically include financing components or non-cash consideration. At times, our contracts include consideration payable to a customer in the form of fixed discounts or rebates. We record the consideration payable to a customer as a reduction to the transaction price resulting in a reduction to revenue over the service period.

If we enter into contracts that contain multiple promised services, we evaluate which of the promised services represent separate performance obligations based on whether or not the promised services are distinct and whether or not the services are separable from other promises in the contract. If these criteria are met, then we allocate the transaction price to the performance obligations using the relative stand-alone selling price method at contract inception.

*Hardware Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart building solutions. We sell hardware to building developers through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer.

9

The Company provides warranties related to the intended functionality of the products and those warranties typically allow for the return of defective hardware up to one year for electrical components and five years for mechanical components past the date of sale.

32.    In addition, from before the beginning of the Class Period, Latch disclosed non-GAAP key performance indicators, including "Total Bookings" and "Hardware Bookings" when Hardware Sales were at least 80 percent of total sales. According to the Company's annual report on Form 10-K for the fiscal year ended December 31, 2021 ("2021 10-K"), that it filed with the SEC on March 1, 2022, Latch hardware customers sign written but non-binding LOIs to purchase products. Latch discloses these key performance indicators publicly as Hardware Bookings and, in turn, Total Bookings. The 2021 10-K disclosed that the reported Bookings did not reflect discounts and stated that "based on historical experience we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target date delivery date no longer than 24 months following LOI signature." It explained that Bookings which do not ship within a 36-month construction timeframe are adjusted.

33.    Explaining the relationship between bookings and future revenue, the Prospectus describes bookings as "represent[ing] written but non-binding LOIs from our customers to purchase Latch hardware products and software services, not reflecting discounts…Based on historical experience, we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target delivery date no longer than 24 months following LOI signature." Additionally, the Company explained, "Hardware Bookings represent the total revenue commitment to be recognized at time of shipment of the product. We calculate Hardware Bookings," the Company continued, "by multiplying the total booked units by the sales price (excluding discounts) for each respective unit. There is typically a lag between Hardware

Bookings and recognition of GAAP revenue due to installation timelines with a target delivery date no longer than 24 months following LOI signature."

34.     For 2019, 2020, 2021, and the first quarter of 2022, Latch violated both GAAP and SEC regulations, by filing periodic reports with the SEC which contained materially misstated financial statements and misleading key non-GAAP performance indicators.

### 3.     Former Latch Employees Detail How Latch Misreported Both GAAP and Non-GAAP Key Business Metrics

35.     Confidential Witness 1 ("CW1") initially worked as a Channel Executive at Latch at the beginning of the Class Period and then became Regional Vice President of Channel Sales during the Class Period.

36.     Confidential Witness 2 ("CW2") was vice president of channel development at Latch during the Class Period. He first joined the Company in August 2018, initially as channel account manager, and also worked in the roles of general manager, Canada and senior director of channel development. CW2 reported to Chris Lee, then Latch's Chief Revenue Officer.

37.     Confidential Witness 3 ("CW3") was director of national channel partnerships and field sales at Latch from January 2018 until July 2019. CW3 reported to Scott Anderson, who was then Latch's vice president of sales. Later, from July 2021 until March 2022, CW3 was a Latch senior solutions engineer.

38.     Confidential Witness 4 ("CW4") was Latch's vice president of sales: North America from February 2020 until June 2022. Like CW2, CW4 reported to Chris Lee.

### a)     Latch Misrepresented Hardware Bookings as a Metric by Misrepresenting the Conversion of LOIs Into Sales

39.     According to CW1, before approximately March 2022, sales personnel were paid commission on LOIs. The text of the LOIs between Latch and channel partners expressed clearly that they were entirely non-binding. Their purpose was to protect the channel partner's pricing,

but in no way whatsoever to confirm actual product sales. CW1 believed that the actual conversion rate of LOIs from bookings into actual purchase orders was only 15% to 25%.

40.     CW2 first learned about LOIs when he first joined Latch in 2018. As early as that time, Latch paid salespersons commission on LOIs. Latch management told CW2 at the time that the LOIs were an important tool to incentivize salespersons to promote the Latch brand and entice channel partners to sign up for non-binding commitments for future hardware bookings.

41.     According to CW3, he initially left Latch in July 2019 because he was uncomfortable with reporting LOIs as sales. He was instructed to secure LOIs and report them on the premise that LOIs almost all converted into actual sales. That was not the case. Rather, in CW3's experience, only approximately 10% of LOIs ultimately converted into sales.

### b)     Latch Misrepresented Revenue

42.     In a scheme to inflate revenue artificially, according to CW2, in 2022, when he was vice president of channel development, Latch sold hardware such as door locks to channel partners at, for example, $200. In turn, the channel partners sold the same lock to end users for $500. According to CW2, Latch recognized revenue for that sale at the channel partner's sale price to the end-user, not the price the channel partner paid to Latch. For example, if Latch sold a lock to a channel partner for $200 and the channel partner sold it to the end user for $500, Latch would record $500 in revenue. CW2 told several employees in the CFO function that the Company could not recognize that revenue because it did not sell the product for that price, but the finance function employees rebuffed him, stating that Latch's recognition of a channel partner's sale price as its own sale price complied with accounting principles and policies.

43.     In their Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 63, at 14), confirming CW2's recollections of Latch's using false sales prices to book revenue,

Defendants admit that they knowingly and materially misled concerning revenue recognition, booking hardware sales at channel partners' sale prices and not at the price at which Latch sold hardware to channel partners. They did this intentionally, they acknowledge, by booking the difference between Latch's sales price to channel partners and the prices at which channel partners sold to end users as costs of goods sold. This had the impact of materially and artificially increasing revenue, in violation of GAAP. Through this fraudulent practice, Defendants intentionally or severely recklessly materially inflated revenue—a Key Business Metric—artificially. Defendants acknowledge this, writing that "Latch disclosed this very practice in its Class Period filings. E.g., Ex. 1 at 50-51 (disclosing the price differential as "channel partner fees" under "Cost of Revenue")." *Id.*

44.     In fact, in the Prospectus, its 2021 Forms 10-Q, and the 2021 10-K, Latch disclosed that its relevant costs of goods sold "consists primarily of product costs, including manufacturing costs, duties and other applicable importing costs, shipping and handling costs, packaging, warranty costs, assembly costs and warehousing costs, as well as other non-inventoriable costs including personnel-related expenses associated with supply chain logistics and direct deployment, outsourced labor costs and ***channel partner fees***." (Emphasis added). Defendants never publicly disclosed what "channel partner fees" comprise.

45.     Cost of sales, however, are only those costs that are directly related to creating the products that a reporting entity sells.[1] Channel partner fees—whatever they are—are unrelated to Latch's creating the hardware it sells. As such, channel partner fees do not represent an expense but rather establish conclusively that Defendants intentionally and artificially overstated Latch's revenue with an offset to cost of goods sold. In context, this improper smoke and mirrors

---

[1] PwC Financial statement presentation guide §3.5 (November 2022).

accounting enabled Defendants to argue, as they did in their Motion to Dismiss, that they did not understate Latch's net loss.

46.     For Latch, however, net loss was virtually immaterial as a Key Business Metric. Rather, increasing revenue was key to achieving profitability in the future. Indeed, Defendants had told investors again and again that Latch had never earned a profit and was attempting to grow the business, something they attempt to show by artificially and materially inflating revenue. For example, the 2021 10-K states:

> We have experienced net losses in each year since inception, including a net loss of $166.3 million for 2021. We believe we will continue to incur operating losses and negative cash flow in the near-term as we continue to invest significantly in our business, in particular to enhance and develop new LatchOS modules, services and products to position us for future growth. Additionally, we have incurred substantial losses and expended significant resources upfront to market, promote and sell our solutions and products and expect to continue to do so in the future. We also expect to continue to invest for future growth, including for customer acquisition, technology infrastructure, services development, international expansion and expansion into new verticals.

> We expect to continue to incur losses for at least the foreseeable future and ***will have to generate and sustain increased revenues to achieve future profitability***. Achieving profitability will require us to increase revenues, manage our cost structure and avoid significant liabilities. Revenue growth may slow, revenues may decline or we may incur significant losses in the future for a number of possible reasons, including general macroeconomic conditions, increasing competition (including competitive pricing pressures), a decrease in the growth of the markets in which we compete or if we fail for any reason to continue to capitalize on growth opportunities. Additionally, we may encounter unforeseen operating expenses, difficulties, complications, delays and service quality problems or other unknown factors that may result in losses in future periods. If these losses exceed our expectations or our revenue growth expectations are not met in future periods, our financial performance will be harmed and our stock price could be volatile or decline. (Emphasis added).

47.     Defendants' admission in their Motion to Dismiss not only confirms CW2's understanding of how Latch materially and artificially overstated revenue, but show a consciousness of guilt by purposely booking the difference in price in costs of revenue and

disclosing something about channel partner fees that no investor could understand, or infer the true meaning of, from any of Latch's public disclosures.

### c)   Latch Engaged in Channel Stuffing and Unreported Consignment Sales

48.   CW2 remembers that the channel partner program included a program called the Latch Preferred Partner Program, or LPP. Latch offered LPP to select channel partners, providing them with hardware to keep on the shelves to enable quick deliveries. In reality, however, the LPP program was a means of channel stuffing.[2] Latch shipped hardware around. Latch recognized the revenue as soon as it shipped hardware to the channel partners that were part of the program. But when new orders came in, they began stopping channel partners from shipping from their inventory, instead placing new orders so that they could recognize more revenue, leaving the partners with shelves full of hardware.

49.   CW3 witnessed similar channel stuffing practices in 2018 and 2019. CW3 was routinely asked to find channel partners who would participate in channel stuffing. According to CW3, Ali Hussain, Latch's Chief Operating Officer from 2015 to 2022, was the point person for this practice. As soon as a hardware product shipped to one of these channel partners, Latch would recognize the revenue. Latch also offered incentives of extended payment terms and discounts to

---

[2] "Channel stuffing" generally refers to inflation of a Company's sales by shipping to distributors more product than the Company believes distributors can sell in a reasonable time period. It is generally accompanied by granting generous or unlimited rights of return and other incentives to the Company's distributors. Channel stuffing becomes a form of fraud when it is used to book revenues on the basis of goods shipped when such "sales" do not meet all revenue recognition criteria or when they are recognized without an appropriate provision for inevitable product returns. In some instances, channel stuffing is more akin to a consignment arrangement than to a normal sale transaction.

channel partners to take product delivery early, guaranteeing a buyback if channel partners were unable to sell the hardware products. In its 2021 10-K, Latch disclosed that it "provides certain customers a wholesale arrangement with a right of return for non-defective product." CW3 saw a trend of channel partners buying products early under these terms and eventually shipping them back to Latch when they did not sell.

50.     In April or May 2019, CW3 met with Defendant Mitchell, Ali Hussain, and Scott Anderson, and told them that these business practices were not sustainable. Mitchell told CW3 directly that as a startup, Latch had to take risks in how it approached business. Unable to influence any changes, CW3 left the Company.

51.     CW3 returned to Latch in June 2021 as a senior solutions engineer. CW3 stated that prior to returning, he spoke with Chris Lee, then the Company's Chief Revenue Officer, who told him that Latch had cleaned up its business practices because it was going public. Lee told CW3 that Deloitte & Touche LLP ("Deloitte"), the Company's Independent Registered Public Accounting Firm, had reviewed its accounting. After returning, however, CW3 began to hear rumors about LPP. While he was not directly involved in LPP, CW3 observed that it felt very much like the channel stuffing he witnessed two years earlier. Often on sales planning calls, CW3 heard sales staff being urged to convince dealers to take delivery of products early.

52.     CW3 specifically recalled an ongoing relationship with a company called Whiz Cribs, a Chicago-based company, specializing in installation and support of smart products in multifamily buildings. This deal began in August or September 2019 and was still continuing when CW3 returned to Latch in June 2021. In exchange for a loan from Latch to Whiz Cribs, Whiz Cribs accepted large amounts of hardware inventory to hold. According to CW3, these were consignment

sales, but Latch immediately recognized revenue on the hardware product it shipped to Whiz Cribs. CW3 recalls that Defendant Mitchell was directly involved with the Whiz Cribs deal.

53.     Like CW1, CW2, and CW3, CW4 witnessed improper revenue recognition schemes that were pervasive and ongoing during his tenure at Latch.

54.     CW4 understood that recognizing revenue without an ultimate purchaser is improper. Notwithstanding, according to CW4, Latch management routinely recognized revenues upon sending hardware to channel partner distribution warehouses even as the ultimate purchasers had yet to finalize purchase agreements with those channel partners. In fact, according to CW4, Latch offered channel partners material discounts to take the products and keep them on their warehouse shelves. It is noteworthy that, according to Latch's 2021 10-K, its reported Bookings did not reflect these discounts and, thus, portrayed a misleading picture of the Company's prospective revenues. In CW4's experience, only 60 to 70% of Latch's recognized North America revenue represented shipped product, and only 30 to 40% was actual, properly recognized revenue.

55.     CW4 saw Latch management go even further, shipping hardware from its warehouse to a distribution warehouse it controlled, claiming it as revenue without any evidence of transfer to a bona fide buyer.

56.     Thus, according to witnesses with actual knowledge of Latch's sales and revenue recognition process, senior Latch officers, themselves, orchestrated and knew of and encouraged several different schemes and devices to inflate revenue by recognizing revenue for material hardware sales either prematurely and/or improperly. These witnesses also saw Latch improperly using LOIs to make Hardware Bookings and, in turn, Total Bookings, a non-GAAP measure that is material to investors, appear far more promising than they really were.

### 4.   Describing the Audit Committee Investigation, Latch Concedes Its Management Engaged in Intentional Misconduct

57.     According to the Form 8-K the Company filed on August 25, 2022, Latch's revenue misstatements most likely relate to sales of hardware devices and its previously issued financial statements should not be relied upon "as a result of material errors **and possible irregularities.**" (Emphasis added).

58.     While "[t]he term *errors* refers to *unintentional* misstatements or omissions of amounts or disclosures in financial statements. … The term *irregularities* refers to *intentional* misstatements or omissions of amounts or disclosures in financial statements. Irregularities include fraudulent financial reporting undertaken to render financial statements misleading, sometimes called *management fraud*, and misappropriation of assets, sometimes called *defalcations*." (American Institute of Certified Public Accountants, Statement on Auditing Standards No. 53 ("SAS 53")).[3]

59.     In other words, on August 25, 2022, through its Audit Committee, consisting of outside directors, the Company admitted that the initial Investigation had identified possible intentional fraud by management. It has since announced that the Investigation is substantially complete but has failed to disclose those results since Plaintiff has brought this action for fraud. This conduct shows that Defendants are withholding material information about the results of its Investigation and the magnitude of its overstatement of both revenue and hardware bookings from investors.

---

[3] Although SAS 53 was superseded, it is the only accounting or auditing standard which distinguishes errors from irregularities as they pertain to financial reporting.

**B.      Defendants' Revenue Recognition Practices Violated GAAP and SEC Regulations and Misled Investors**

60.      GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. The SEC Rules and interpretive releases and the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") represent sources of authoritative GAAP for SEC registrants. (ASC 105-10-05-1) Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

61.      Revenue is one of the most important financial statement measures to users of financial statements. It is used to measure and assess aspects of a reporting entity's past financial performance, future prospects, and financial health. Revenue was especially important to Latch, given that, as acknowledged in its Proxy, Latch was an early-stage company with a history of losses and no immediate prospects of profitability. As a direct result of Latch's improper revenue recognition practices, the Company represented its financial position and results of operations in a manner which materially violated GAAP.

62.      In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update ("ASU") No. 2014-09, Revenue from Contracts with Customers (Accounting Standards Codification "ASC" Topic 606). Latch adopted ASC 606 effective January 1, 2018. This new standard replaced all previous accounting guidance on this topic and eliminated all industry-specific guidance. The revenue recognition guidance in ASC 606 provides a unified

model to determine how revenue is recognized. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. (ASC 606-10-05-3)

63.     Revenue is recognized in accordance with this core principle by applying the following five steps:

Step 1: Identify the contract(s) with a customer. A contract is an agreement between two or more parties that creates enforceable rights and obligations.

Step 2: Identify the performance obligations in the contract, such as promises to transfer goods or services to a customer.

Step 3: Determine the transaction price, which is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. Transaction price can include fixed and variable consideration. If the consideration is variable, an entity estimates the amount of consideration to which it will be entitled in exchange for the promised goods or services. The estimated amount of variable consideration will be included in the transaction price only to the extent that it is probable that a significant reversal in the amount of cumulative revenue recognized will not occur when the uncertainty associated with the variable consideration is subsequently resolved.

Step 4: Allocate the transaction price to the performance obligations in the contract. An entity typically allocates the transaction price to each performance obligation on the basis of the relative standalone selling prices of each distinct good or service promised in the contract.

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation. An entity recognizes revenue when (or as) it satisfies a performance obligation by transferring a promised good or service to a customer (which is when the customer obtains control of that good or service). The amount of revenue recognized is the amount allocated to the satisfied performance obligation. (ASC 606-10-05-4)

64.     Latch's disclosed accounting policy was consistent with ASC 606, which mislead its financial statement users into believing that Latch's revenue recognition practices complied with GAAP when, in reality, they did not.

### 1.   Channel Stuffing

65.     Latch violated GAAP by failing to appropriately adjust the transaction price on sales from shipments of hardware to warehouses owned by its channel partners who had no current need for the product and/or ability to sell it in a reasonable time period. As discussed above, in certain instances Latch controlled the channel partner's warehouse. Such practice is known as "channel stuffing."

66.     GAAP requires revenue to be recognized when (or as) an entity satisfies a performance obligation by transferring a promised good or service to a customer, which is when the customer obtains control of that good or service. (ASC 606-10-05-04). The following are some indicators that an entity should consider in determining when the customer obtained control. The customer has:

a.      a present obligation to pay;

b.      legal title;

c.      physical possession;

d.      risks and rewards or ownership; and

e.      accepted the asset. (ASC 606-10-25-30)

67.     Latch improperly recognized revenue when it shipped hardware from its warehouse to a distribution warehouse it controlled because such transfers did not constitute transfer of control over the hardware products.

68.     When recording revenue, GAAP required Latch to determine the transaction price, which is "the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer." (ASC 606-10-05-4). When determining the transaction price, an entity is required, among other factors, to consider the effects of variable consideration and other cash and non-cash consideration payable to a customer. (ASC

606-10-32-3). The amount of consideration included in the transaction price may vary when products are sold with a right of return or because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items. (ASC 606-10-32-6). GAAP prohibits recognizing revenue for any products expected to be returned. (ASC 606-10-55-23).

69.     The estimate of expected returns should be calculated in the same way as other variable consideration. (ASC 606-10-32-6). The estimate should reflect the amount that the reporting entity expects to repay or credit customers. (ASC 606-10-32-8). An entity is required to constrain its estimate of expected returns to an amount that is probable that a significant reversal in the amount of cumulative revenue will not be recognized. (ASC 606-10-32-11). The constraint's objective is to ensure the transaction price does not include amounts subject to the risk of a significant revenue reversal as a result of subsequent changes in estimates.

70.     According to KPMG's revenue handbook, a company should consider (a) significant increases in or excess levels of inventory in a distribution channel (i.e., 'channel stuffing') and (b) lack of 'visibility' into or the inability to determine or observe the levels of inventory in a distribution channel and the current level of sales to end customers, among other factors, when applying the constraint.[4]

71.     "For any amounts received (or receivable) for which an entity does not expect to be entitled, the entity should not recognize revenue when it transfers products to customers but should recognize those amounts received (or receivable) as a refund liability. Subsequently, at the end of each reporting period, the entity should update its assessment of amounts for which it

---

[4] KPMG Revenue recognition handbook (December 2021), Section 5.4.20, *Accounting for a right of return*.

expects to be entitled in exchange for the transferred products and make a corresponding change to the transaction price and, therefore, in the amount of revenue recognized." (ASC 606-10-55-25). "An entity should update the measurement of the refund liability at the end of each reporting period for changes in expectations about the amount of refunds. An entity should recognize corresponding adjustments as revenue (or reductions of revenue)." (ASC 606-10-55-26). Latch disclosed that its sales terms in wholesale arrangements included rights of return of non-defective products, which it "treated as a reduction of hardware revenue based on the Company's expectations and historical experience."

72.     Prior to going public, Latch's reserve for wholesale returns ranged from $1.5 million at the end of 2019 to $1.8 million at the end Q1 2021. During Q2 2021, however, the first quarter Latch traded publicly, Defendants materially reduced Latch's reserve for wholesale returns to only $400,000. In turn, it increased its Q2 2021 revenue by least $1.4 million, releasing its previously accrued reserve for wholesale returns. Only by releasing this reserve was Latch able to meet its Q2 2022 revenue guidance, which it otherwise would have missed. Although the aforementioned reserve release increased Latch's Q1 2021 reported revenues, its financial statements failed fully describe the effect changes in the reserve had on the Company's revenue, disclosing only that "[f]or both the three and six months ended June 30, 2021, the reserve for wholesale returns against revenue was $0.4 million."

73.     Significant customers likely represented the wholesale relationships for which the Company purportedly granted unlimited rights of return. The following table shows that revenue from significant customers (which likely includes the improperly recognized sales due to channel stuffing) was sufficient to enable the Company to meet its revenue guidance, even when netted with reported reserves for wholesale returns:

| (amounts in $000's) | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | FY 2021 12/31/2021 | Q1 2022 3/31/2022 |
|---|---|---|---|---|
| Revenue (significant customers) | $ 2,000 | $ 1,800 | $ 4,900 | $ 4,400 |
| Reserve for wholesale returns (revenue) | $ (400) | $ 300 | $ 100 | $ - |
| | $ 1,600 | $ 2,100 | $ 5,000 | $ 4,400 |
| *% of total net revenue* | *17.8%* | *18.8%* | *12.1%* | *32.2%* |
| Total reported revenue | $ 9,012 | $ 11,197 | $ 41,360 | $ 13,655 |
| Excess of reported revenue over the lower end of the range of Company's guidance | $ 12 | $ 1,197 | $ 3,360 | $ 955 |

## 2.    Disclosure of Known Trends

74.    SEC regulations govern the content of registrants' disclosures in their filings with the SEC. SEC Regulation S-K requires that every Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. §229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

75.    Specifically, Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

(i)   Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

(ii)   Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments),

the change in the relationship shall be disclosed.

76.     Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition.

77.     Channel stuffing robs sales from future periods to show revenue in a current period. Excess sales into the "channel" in one period will likely have negative impacts on future sales. Therefore, Defendants violated the affirmative duties imposed by Regulation S-K, and thus Section 10(b) of the Exchange Act, by failing to disclose the effects of "channel stuffing" programs, not only related to current results but also to the prospects of future sales. Latch's filings did not contain the required disclosures of the impact its deliberate and unsustainable channel stuffing practices would have on its revenues or income from continuing operations.

### 3.     Accounting for Consignment Sales

78.     Consignment sales occur when an entity ships goods to a distributor but retains control of the goods until a predetermined event occurs. When delivering products to customers, GAAP required Latch to evaluate whether the customers had obtained control of the products at that point in time and prohibited Latch from recognizing revenue upon delivery of products if the products were held on consignment. (ASC 606-10-55-79).

79.     Under ASC 606-10-55-80, indicators that an arrangement is a consignment arrangement include, but are not limited to, the following:

> The product is controlled by the entity until a specified event occurs, such as the sale of the product to a customer of the dealer, or until a specified period expires.

> The entity is able to require the return of the product or transfer the product to a third party (such as another dealer).

The dealer does not have an unconditional obligation to pay for the product (although it might be required to pay a deposit).

80.     A distributor may have physical possession of the goods, but might not control them in a consignment arrangement. For example, a distributor that is required to return goods to the manufacturer upon request might not have control over those goods. GAAP bound Latch to recognize revenue only when it had ***transferred control*** of the goods to the distributor (in Latch's practice, a channel partner). A consignment sale differs from a sale with a right of return. The customer has control of the goods in a sale with right of return and can decide whether to return the goods back to the seller. For example, according to CW3, Latch had a consignment arrangement with Whiz Cribs, and as a result of its policy to recognize sales upon shipment of hardware products, the Company improperly recognized revenue from this consignment arrangement when it shipped product to Whiz Cribs rather than when control transferred to Whiz Cribs.

### 4.      Required Disclosures

81.     The objective of revenue disclosure requirements is to disclose sufficient information to enable users of financial statements to understand the nature, amount, timing, and uncertainty of revenue and cash flows arising from contracts with customers. (ASC 606-10-50-1). To achieve this objective, Latch was required to, among other things, disclose qualitative and quantitative information about the significant judgments, and changes in the judgments used in determining both, (a) the timing of revenue recognition and (b) the transaction prices used in determining the reported revenue. (ASC 606-10-50-17 – 20).

82.     Latch did not disclose that it had any consignment sale arrangements. Latch disclosed that it recognized revenue when it shipped products to channel partners, which, in a

consignment arrangement, would result in premature revenue recognition (i.e., recognition of revenue before channel partner obtains control of products). (ASC 606-10-55-79 – 80).

83.     Latch never disclosed in its public filings that the Company inflated transaction prices by recognizing revenue at the channel partner's sale price to end-users rather than Latch's sale price to the channel partners. In their Motion to Dismiss, Defendants admitted that this fraud was carried out by including the price difference, referred to as "channel partner fees," in both, the transaction prices and in its cost of sales. *See* ECF No. 63 at 14. Latch's practice of recognizing revenue based on the price channel partners received from end users, as opposed to the price it received from the channel partners, overstated Latch's revenues in violation of GAAP. In recording revenues, Latch was required to determine the transaction price, which is the amount of consideration in a contract to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer. (ASC 606-10-05-4). By recording sales at the channel partners' prices, Latch knowingly inflated the transaction price, thus, overstating its revenues.

84.     Latch's systemic improper recognition of revenue materially impacted its financial statements during the Class Period. As shown below, Latch reported consistent year-over-year increases in revenue. Revenues reported for the period from Q2 2021 through Q1 2022 met or exceeded Latch's revenue guidance.



| (amounts in $000's) | FY 2019 12/31/2019 | Q1 2020 3/31/2020 | Q2 2020 6/30/2020 | Q3 2020 9/30/2020 | Q4 2020 12/31/2020 | FY 2020 12/31/2020 | Q1 2021 3/31/2021 | Q2 2021 6/30/2021 | Q3 2021 9/30/2021 | Q4 2021 12/31/2020 | FY 2021 12/31/2021 | Q1 2022 3/31/2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hardware and other related revenue | $ 13,501 | $ 2,032 | $ 1,925 | $ 4,093 | $ 6,214 | $ 14,264 | $ 5,014 | $ 7,202 | $ 9,047 | $ 11,872 | $ 33,135 | $ 9,055 |
| Services | | | | | | | | | | | | 1,561 |
| Software revenue | 1,386 | 694 | 827 | 1,002 | 1,274 | 3,797 | 1,615 | 1,810 | 2,150 | 2,650 | 8,225 | 3,039 |
| Total revenue | $ 14,887 | $ 2,726 | $ 2,752 | $ 5,095 | $ 7,488 | $ 18,061 | $ 6,629 | $ 9,012 | $ 11,197 | $ 14,522 | $ 41,360 | $ 13,655 |
| Revenue Guidance (in milions) | | | | | | | $9 - $10 | $10 - $11 | $11.2 - $15.2 | $38 - $42 | | $12.7 – $14.8 |

### C.    Non-GAAP Financial Measures

85.    Rule 100(b) of Regulation G precluded Defendants from making public any non-GAAP financial measure that, taken together with the information accompanying that measure and any other accompanying discussion of that measure, contained an untrue statement of a material fact or omitted to state a material fact necessary in order to make the presentation of the non-GAAP financial measure, in light of the circumstances under which it is presented, not misleading. (17 CFR § 244.100(b)). Detailed disclosure about the nature and effect of each adjustment would not prevent the non-GAAP measure from being materially misleading. (SEC Staff Compliance & Disclosure Interpretations ("C&Dis") Update 100.06). Furthermore, Item 10(e) of Regulation S-K, prohibits (a) excluding charges or liabilities that are required, or will require, cash settlement, or would have required cash settlement absent an ability to settle in another manner, from non-GAAP liquidity measures and (b) adjusting a non-GAAP performance measure to eliminate or

smooth items identified as non-recurring, infrequent, or unusual, when (1) the nature of the charge or gain is reasonably likely to recur within two years or (2) there was a similar charge or gain within the prior two years. (17 CFR § 229.10 (e)(1)(ii)).

86.     Latch's filings disclosed that its bookings, which represented purported revenue commitments, were "not reflecting discounts" (i.e., were reported at prices specified in the LOIs without regard for the value of future concession, including rights of return of unsold products, which Latch granted to its channel partners). As stated above, Latch granted significant discounts to its channel partners and was required to reduce its revenues in recognition of discounts and future returns of excess inventory. So, for example, if a letter of Intent specified a sale "commitment" of $200 worth of hardware products but Latch knew that it would ultimately only be able to receive only $180, it did not reduce its bookings to reflect the expected decrease in the purchase consideration to be collected. Thus, Latch's disclosures of its bookings violated the SEC regulations not only because they were based on the inflated transaction prices but also because Latch intentionally inflated the volume hardware bookings, a key non-GAAP performance indicator, on the basis of LOIs, which were non-binding. Indeed, Defendants admitted this themselves.

## D.     Restatement and Materiality

87.     ASC Topic 250, *Accounting Changes and Error Corrections*, addresses accounting and disclosures required when a company discovers errors in its previously filed financial statements. ASC 250 distinguishes errors from accounting changes, and defines an error as "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements

were prepared. A change from an accounting principle that is not generally accepted to one that is generally accepted is a correction of an error." (ASC 250-10-20 – Glossary).

88.    The Company's disclosures show that it had discovered a multi-period error:

> As previously disclosed, based on the findings of the Investigation, the Audit Committee, after discussion with management, determined that the Company's consolidated financial statements for 2019, 2020, 2021 and the first quarter of 2022 (all such interim and annual periods, the "Affected Periods") should no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue. Accordingly, the Audit Committee, in consultation with the Company's management, determined that the Company's consolidated financial statements for the Affected Periods will be restated. Any previously issued or filed reports, registration statements, proxy statements, prospectuses, press releases, earnings releases, investor presentations or other communications including, describing or incorporating by reference the Company's consolidated financial statements and other related financial information covering the Affected Periods should no longer be relied upon. *See* April 3, 2023 Form NT 10-K and May 16, 2023 Form NT 10-Q.

89.    ASC 250 states that if a company must correct a prior period error, it should do so by restating the prior-period financial statements including the following:

> The cumulative effect of the error on periods prior to those presented shall be reflected in the carrying amounts of assets and liabilities as of the beginning of the first period presented.

> An offsetting adjustment, if any, shall be made to the opening balance of retained earnings (or other appropriate components of equity or net assets in the statement of financial position) for that period.

> Financial statements for each individual prior period presented shall be adjusted to reflect correction of the period-specific effects of the error.

> *(*ASC 250-10-45-23).

90.    ASC 250 further requires disclosure that "previously issued financial statements have been restated, along with a description of the nature of the error", including "the effect of the correction on each financial statement line item… for each prior period presented" and "the cumulative effect of the change on retained earnings …as of the beginning of the earliest period presented." (ASC 250-10-50-7)

91.     In addition, Item 4.02 of Form 8-K requires specific disclosures when "the registrant's board of directors …concludes that any previously issued financial statements …should no longer be relied upon because of an error in such financial statements." In its August 25, 2022 Form 8-K, the Company disclosed that its 2021 and Q1 2022 financial statements "should no longer be relied upon as a result of material errors and possible irregularities" and will be restated. Further, in its January 23, 2023 Form 10-K, the Company disclosed that, in addition to the 2021 and Q1 2022, its 2019 and 2020 financial statements "should no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue" and will also be restated.

92.     Such disclosures of "non reliance on previously issued financial statements" are associated with what is colloquially called by the accounting profession a "Big R restatement." A Big R restatement occurs when the error is *material* to the prior period financial statements.

93.     FASB's Statements of Financial Accounting Concepts provide the framework for financial accounting, including the concept of materiality. As FASB's Statement of Financial Accounting Concepts No. 8 ("CON 8") states, the "objective of general purpose financial reporting is to provide financial information about the reporting entity that is ***useful*** to existing and potential investors, lenders, and other creditors ***in making decisions*** about providing resources to the entity" (CON 8 ¶ OB2, emphasis added). A primary quality that renders financial information useful is faithful representation. For an entity to faithfully represent what it purports to represent, information must be complete, neutral, and ***free from error*** (CON 8 ¶ QC12, emphasis added). CON 8 further explains that materiality is entity specific: *"**The omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the**"*

*report would have been changed or influenced by the inclusion or correction of the item."* (Emphasis added) (CON 8 ¶ QC11).

94.     SEC Staff Accounting Bulletin ("SAB") Topics 1.M and 1.N (formerly referred to as SAB Nos. 99 and 108, respectively) provides further guidance on materiality. SAB Topic 1.M offers the most comprehensive guidance on the determination of materiality of misstatements of financial statements. It brings together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court. Topic 1.M addresses misstatements or omission of amounts, classifications, manner of presentation and disclosures in financial statements. It provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) could be material. "The shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

95.     In summary, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements. By announcing that a restatement is necessary, the Company admitted that its 2019 – Q1 2022 financial statements were materially misstated.

### E.   Defendants' Internal Control Obligations

96.   As detailed below, even as they disclosed other internal control problems, Defendants omitted from their disclosures to investors that the Company lacked internal controls over financial reporting, particularly over revenue recognition and reporting of key non-GAAP performance indicators due to its practice of intentionally inflating revenues and Hardware Bookings by recognizing revenue prematurely and/or at inflated pieces and reporting of Hardware Bookings based on LOIs. Accurate disclosures concerning internal controls are material to investors.

97.   The Committee of Sponsoring Organizations of the Treadway Commission (COSO) Internal Control—Integrated Framework ("Framework") was originally issued in 1992 and refreshed in 2013. The Framework was developed as guidance to help improve confidence in all types of data and information.

98.   The Framework sets forth three categories of objectives, which allow organizations to focus on separate aspects of internal control:

- *Operations Objectives*—These pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss.

- *Reporting Objectives*—These pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, standard setters, or the entity's policies.

- *Compliance Objectives*—These pertain to adherence to laws and regulations to which the entity is subject.

99.   Management, with board oversight, sets entity-level objectives that align with the entity's mission, vision, and strategies. Management and the board of directors establish goals and targets toward the achievement of objectives that by their nature create pressures within the organization. Excessive pressures are most commonly associated with:

- Unrealistic performance targets, particularly for short-term results;

- Conflicting objectives of different stakeholders;

- Imbalance between rewards for short-term financial performance and those for long-term focused stakeholders, such as corporate sustainability goals.

For example, pressure to generate sales levels that are not commensurate with market opportunities can lead sales managers to falsify numbers or engage in bribery or other illicit acts.

100.    Setting objectives is a prerequisite to internal control and a key part of the management process relating to strategic planning.

101.    COSO defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."

102.    Internal control is not one event or circumstance, but a dynamic and iterative process— actions that permeate an entity's activities and that are inherent in the way management runs the entity. Embedded within this process are controls consisting of policies and procedures. These policies reflect management or board statements of what should be done to effect internal control. Such statements may be documented, explicitly stated in other management communications, or implied through management actions and decisions. Procedures consist of actions that implement a policy.

103.    Internal control is effected by the board of directors, management, and other personnel. It is accomplished by the people of an organization, by what they do and say. The board and senior management establish the tone for the organization concerning the importance of internal control and the expected standards of conduct across the entity. The board of directors and senior management establish the tone at the top regarding the importance of internal control including expected standards of conduct. Management reinforces expectations at the various levels

of the organization. The resulting control environment has a pervasive impact on the overall system of internal control.

104.    Tone is impacted by the operating style and personal conduct of management and the board of directors, attitudes toward risk, and positions, which may be conservative or aggressive (e.g., position on estimates, policy choices), and degree of formality (e.g., in a smaller family business, controls may be more informal), all of which sends a message to the organization. Personal indiscretion, lack of receptiveness to bad news, or unfairly balanced compensation practices could impact the culture and ultimately provide an incentive for inappropriate conduct. In contrast, a history of ethical and responsible behavior by management and the board of directors and demonstrated commitment to addressing misconduct send strong messages in support of integrity. Employees are likely to develop the same attitudes about right and wrong—and about risks and controls—as those shown by management. Individual behavior is often influenced by the knowledge that the chief executive officer has behaved ethically when faced with a tough business-based or personal decision, and that all managers have taken timely action to address misconduct.

105.    Tone at the top and throughout the organization is fundamental to the functioning of an internal control system. Without a strong tone at the top to support a strong culture of internal control, awareness of risk can be undermined, responses to risks may be inappropriate, control activities may be ill defined or not followed, information and communication may falter, and feedback from monitoring activities may not be heard or acted upon.

106.    The board of directors ultimately holds the chief executive officer accountable for understanding the risks faced by the entity and establishing the requisite system of internal control to support the achievement of the entity's objectives. The chief executive officer and senior management, in turn, are responsible for designing, implementing, conducting, and periodically

assessing the structures, authorities, and responsibilities needed to establish accountability for internal control at all levels of the organization.

107.    As the CWs recall, the tone at the top of Latch encouraged sales personnel to find channel stuffing opportunities and dismissed employee concerns about unsustainable business practices as necessary risks for a new company.

**F.    False and Misleading Statements During the Class Period**

108.    The Class Period begins on June 7, 2021. After Latch completed the Business Combination on June 4, 2021, its officers and directors were duty bound to correct any false statements Defendants had provided to TSIA for inclusion in the Prospectus. They did not, rendering them liable as of the opening of trading on June 7, 2021, for false and misleading statements in the Prospectus.

109.    The May 13, 2021, Prospectus provided historical financial statements for Latch for 2019 and 2020. These indicated that Latch had $14.887 million in total revenue and $50.226 million in net loss for 2019, and $18.061 million in total revenue and $65.994 million in net loss for 2020. About "Key Business Metrics, the Prospectus included the following chart:

| (In thousands) | 2020 | 2019 | $ Change | % Change |
|---|---|---|---|---|
| **U.S. GAAP Measures:** | | | | |
| Revenue | $ 18,061 | $ 14,887 | $  3,174 | 21% |
| Net Loss | $(65,994) | $(50,226) | $(15,768) | (31)% |
| | | | | |
| Adjusted EBITDA | $(54,842) | $(44,930) | $  (9,912) | (22)% |

110.    The foregoing disclosure of Latch's revenue, net loss, and adjusted for 2019 and 2020 was materially false and misleading. In violation of GAAP, Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue, the Company's most important GAAP Key Business Metric. After 16

months Defendants have refused to disclose either the results and conclusions of the Audit Committee's Investigation or the amounts by which they knowingly or recklessly caused Latch to overstate revenue and to understate both net loss and adjusted EBITDA. By admitting the need to restate their financial statements for 2019, 2020, 2021, and the first quarter of 2022, however, Defendants admit that those financial statements were materially false.

111.   Also under its Key Business Metrics, Defendants disclosed bookings as follows:

**Key Performance Indicators:**

| | | | | |
|---|---|---|---|---|
| Hardware Bookings | $ 72,511 | $ 40,800 | $ 31,711 | 78% |
| Software Bookings | $ 92,454 | $ 69,809 | $ 22,645 | 32% |
| Total Bookings | $ 164,965 | $ 110,609 | $ 54,356 | 49% |
| Booked ARR | $ 31,134 | $ 14,486 | $ 16,648 | 115% |
| Booked Home Units—Cumulative | 304,749 | 144,699 | 160,050 | 111% |

112.   The foregoing disclosure of Latch's Hardware Bookings and Total Bookings was materially false and misleading because Defendants also knew or recklessly disregarded that the reported Total Bookings were misleading as they were developed on the basis of LOIs and did not reflect discounts.

113.   In the Prospectus, Defendants warned that Latch's internal controls over financial reporting, stating:

> ***As a private company, we have not been required to document and test our internal controls over financial reporting nor has our management been required to certify the effectiveness of our internal controls and our auditors have not been required to opine on the effectiveness of our internal control over financial reporting. We have identified material weaknesses in our internal control over financial reporting which, if not corrected, could affect the reliability of our consolidated financial statements and have other adverse consequences***.
>
> A material weakness is a deficiency or combination of deficiencies in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the financial statements would not be prevented or detected on a timely basis.

Latch has identified material weaknesses in its internal control over financial reporting that Latch is currently working to remediate, which relate to: (a) Latch's general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology.

Latch's management has concluded that these material weaknesses in Latch's internal control over financial reporting are due to the fact that Latch is a private company with limited resources and does not have the necessary business processes and related internal controls formally designed and implemented coupled with the appropriate resources with the appropriate level of experience and technical expertise to oversee Latch's business processes and controls.

Latch's management is in the process of developing a remediation plan. The material weaknesses will be considered remediated when Latch's management designs and implements effective controls that operate for a sufficient period of time and management has concluded, through testing, that these controls are effective. Latch's management will monitor the effectiveness of its remediation plans and will make changes management determines to be appropriate.

If not remediated, these material weaknesses could result in material misstatements to Latch's annual or interim consolidated financial statements that might not be prevented or detected on a timely basis, or in delayed filing of required periodic reports.

114.    The foregoing risk warning about Latch's internal controls over financial reporting was materially false and misleading. Defendants omitted that the Company lacked internal controls over financial reporting specifically due to its practice of intentionally inflating hardware bookings on the basis of LOIs and recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of on incorrect sales prices, and by improperly recognizing sales from consignment arrangements.

115.    On June 9, 2021, Latch announced its first quarter 2021 financial results in a press release, disclosing that Latch had achieved $6.6 million in revenue and had net loss of $38 million.

It also announced Total Bookings of $71.7 million. In that release, Defendant Schoenfelder touted the Company's "strong start to the year, highlighted by a sharp acceleration in Total Bookings and revenue growth[.]"

116.    This foregoing disclosure of Latch's revenue and net loss for the first quarter of 2021, ended March 31, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. Defendants also knew or recklessly disregarded that the reported Total Bookings were misleading as they were developed on the basis of LOIs and did not reflect discounts. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue and bookings growth, since that reported growth was based on materially false results.

117.    The press release also provided guidance for the second quarter of 2021, stating that the Company expected revenue in the range of $9 to $10 million.

118.    On June 25, 2021, Latch filed a Registration Statement on Form S-1, repeating the previously reported financial results for the first quarter of 2021, stating that "For the three months ended March 31, 2021, and 2020, the reserve for wholesale returns against revenue was zero and $55, respectively. The reserve against accounts receivable as of March 31, 2021, and December 31, 2020, was $1,775 and $1,787, respectively." (These numbers are given in thousands.)

119.    On August 12, 2021, Latch announced its second quarter 2021 financial results in a press release, disclosing that Latch had achieved $9.0 million in revenue and had net loss of $40 million, achieving the Q2 2021 revenue guidance, Defendants had projected in their June 9, 2021, press release. Latch also announced Total Bookings of $95.8 million. In that release, Defendant

Schoenfelder touted "powerful demand for our products that drove a sharp acceleration in Total Bookings and revenue growth in the first half of the year[.]"

120.    This foregoing disclosure of Latch's revenue and net loss for the second quarter of 2021, ended June 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. Defendants also knew or recklessly disregarded that the reported Total Bookings were misleading as they were developed on the basis of LOIs and did not reflect discounts. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue and bookings growth, since that reported growth was based on materially false results.

121.    On August 13, 2021, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2021, repeating the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses. Defendants Schoenfelder and Mitchell signed the 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

122.    This foregoing disclosure of Latch's revenue and net loss for the second quarter of 2021, ended June 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. The disclosure of the Company's Total Bookings was materially false and misleading because Defendants knew or recklessly disregarded that they were developed on the basis of LOIs and did not reflect discounts. More, Defendants materially misrepresented the state of the Company's internal controls. While they disclosed that Latch had material weaknesses

relating to " (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology," they omitted that the Company lacked internal controls over financial reporting due to its practice of intentionally inflating hardware bookings on the basis of LOIs and recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control , on the basis of on incorrect sales prices, and by improperly recognizing sales from consignment arrangements in par.

123.    The August 13, 2021, 10-Q also shows that to meet the $9 million target for revenue set in the previous quarter, the Company released reserve for wholesale returns, which was $1.775 million as of March 31, 2021, according to the June 25, 2021 S-1. This release was used to meet Latch's revenue projection in the Company's first full quarter as a public company. Latch's financial statements did not reveal this fact disclosing only that "[f]or both the three and six months ended June 30, 2021, the reserve for wholesale returns against revenue was $0.4 million. … The reserve against accounts receivable as of June 30, 2021 … was $0.4 million … ." This disclosure was aimed at concealing the fact that the reserve for wholesale returns, which Latch had built up as a private company, was used to meet its first ever revenue target as a public company.

124.    On November 9, 2021, Latch announced its third quarter 2021 financial results in a press release, disclosing that Latch had achieved $11.2 million in revenue and had net loss of $34.2 million. It also announced Total Bookings of $96.0 million. In that release, Defendant Schoenfelder touted the Company's revenue, describing the quarter as "another record quarter for Latch, with 120% revenue growth year-over-year."

125.    This foregoing disclosure of Latch's revenue and net loss for the third quarter of 2021, ended September 30, 2021, was materially false and misleading because Defendants knew

and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. The disclosure of the Company's Total Bookings was materially false and misleading because Defendants knew or recklessly disregarded that they were developed on the basis of LOIs and did not reflect discounts. More, Defendant Schoenfelder's statement was materially false and misleading because it materially misrepresented the Company's revenue growth since that reported growth was based on materially false results.

126.    On November 10, 2021, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2021, repeating the previously reported financial results. It also stated that the Company's "disclosure controls and procedures were not effective" due to the previously disclosed material weaknesses. Defendants Schoenfelder and Mitchell signed the 10-Q, appending their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

127.    This foregoing disclosure of Latch's revenue and net loss for the third quarter of 2021, ended September 30, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. The disclosure of the Company's Total Bookings was materially false and misleading because Defendants knew or recklessly disregarded that they were developed on the basis of LOIs and did not reflect discounts. More, Defendants materially misrepresented the state of the Company's internal controls. While they disclosed that Latch had material weaknesses relating to " (a) general segregation of duties, including the review and approval of journal entries; (b) lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology[,]" they omitted that the

Company lacked internal controls over financial reporting due to its practice of intentionally inflating hardware bookings on the basis of LOIs and recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of on incorrect sales prices, and by improperly recognizing sales from consignment arrangements in par.

128.   On February 24, 2022, Latch announced its fourth quarter and full year 2021 financial results in a press release, disclosing that Latch had achieved $14.5 million in revenue with $53.9 million in net loss during the previous quarter and $41.4 million in net revenue with $166.3 million in net loss for the year ended December 31, 2021. The Company also announced Total Bookings of $96.8 million for the previous quarter and $360.2 million in Total Bookings for the year ended December 31, 2021.

129.   This foregoing disclosure of Latch's revenue and net loss for the fourth quarter and full year of 2021, ended December 31, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. The disclosure of the Company's Total Bookings was materially false and misleading because Defendants knew or recklessly disregarded that they were developed on the basis of LOIs and did not reflect discounts.

130.   On March 1, 2022, Latch filed its annual report on Form 10-K for the period ended December 31, 2021 (the "2021 10-K"), repeating the previously reported financial results. Defendant Schoenfelder and Mitchell signed the 2021 10-K, appending as Exhibits their signed SOX certifications attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

131.   This disclosure of Latch's revenue and net loss for the full year of 2021, ended December 31, 2021, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue. The disclosure of the Company's Total Bookings was materially false and misleading because Defendants knew or recklessly disregarded that they were developed on the basis of LOIs and did not reflect discounts. More, Defendants materially misrepresented the state of the Company's internal controls. While they disclosed that Latch had material weaknesses relating to "(a) our general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; (c) selection and development of control activities, including over information technology related to certain account balances; and (d) accounting for complex financial instruments[,]" they omitted that the Company lacked internal controls over financial reporting due to its practice of intentionally inflating hardware bookings on the basis of LOIs and recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of on incorrect sales prices, and by improperly recognizing sales from consignment arrangements in par.

132.   Regarding the Company's revenue recognition policy for hardware, the 2021 10-K stated, in relevant part:

*Hardware and Other Related Revenue*

We generate hardware revenue primarily from the sale of our portfolio of devices for our smart access and smart apartment solutions. We sell hardware to building developers directly or through our channel partners who act as the intermediary and installer. We recognize hardware revenue when the hardware is shipped directly to building developers or to our channel partners, which is when control is transferred to the building developer. … We also provide certain customers a wholesale arrangement with a right of return for non-defective products, which is treated as a reduction of hardware revenue based on our expectations and historical experience.

133.   This disclosure was materially false and misleading because Defendants knew and/or disregarded that they were not, in fact, recognizing hardware revenue when control over its products transferred. Rather, the Company was routinely recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of incorrect sales prices, and from consignment sales.

134.   On May 5, 2022, Latch announced its first quarter 2022 financial results in a press release, disclosing that Latch had achieved $13.7 million in revenue with $44.2 million in net loss during the previous quarter. As of May 5, 2022, Latch no longer announced as an individual metric its Total Bookings, finally abandoning its practice of misleading investors concerning the potential for future revenue with its disclosure of its bookings.

135.   This foregoing disclosure of Latch's revenue and net loss for the first quarter of 2022, ended March 31, 2022, was materially false and misleading because Defendants knew and/or recklessly disregarded that they had improperly recognized revenue and consequently materially overstated Latch's revenue.

136.   Also on May 5, 2022, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2022, repeating the previously reported financial results. The report also stated that the previously disclosed material weakness in its internal control over financial reporting had not been remediated. With respect to its revenue recognition policy, Latch stated, in relevant part:

> The Company generates hardware revenue primarily from the sale of its portfolio of devices for its smart access and smart apartment solutions. The Company sells hardware to building developers directly or through its channel partners who act as the intermediary and installer. The Company recognizes hardware revenue when the hardware is shipped directly to building developers or to its channel partners, which is when control is transferred to the building developer. … The Company

also provides certain customers a wholesale arrangement with a right of return for non-defective product, which is treated as a reduction of hardware revenue based on the Company's expectations and historical experience.

137.    The report was signed by Defendant Schoenfelder and Schaeffer. Appended as Exhibits were signed SOX certifications from Defendants Schoenfelder and Schaeffer, attesting to the accuracy of the financial statements and that all fraud and significant deficiencies and material weaknesses in internal controls were disclosed.

138.    This disclosure was materially false and misleading because Defendants knew and/or recklessly disregarded that the previously reported financial results materially overstated Latch's revenue. It was also materially false and misleading because, even as they admitted that "our internal controls over financial reporting are not effective and that a material weakness exists," Defendants omitted that the Company lacked internal controls over financial reporting due to its practice of recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of on incorrect sales prices, and by improperly recognizing sales from consignment arrangements at par. It was also materially false and misleading because Defendants knew and/or recklessly disregarded that it materially misstated Latch's actual revenue recognition practices. In fact, the Company was routinely recognizing revenue on hardware that was moved to channel partners' facilities without an actual change in control and/or without recording an appropriate allowance for future returns, on the basis of incorrect sales prices, and from consignment sales at par.

## G.    The Truth Emerges but Defendants Continue to Mislead

139.    On August 10, 2022, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it could not file its quarterly report on Form 10-Q for the quarter ended June 30, 2022, because the Audit Committee of the Company's Board of Directors had commenced the

Investigation of alleged current and prior period matters, including Latch's revenue recognition practices.

140.    On August 12, 2022, after the close of trading, Defendants disclosed in a press release and Current Report on Form 8-K, filed with the SEC that day, that Latch's listing on NASDAQ was in jeopardy for its failure timely to file its Form 10-Q for the second quarter of 2022. On this news, on August 15, 2022, the price of Latch common stock fell by $0.24 or 18.5%.

141.    On August 25, 2022, after the market closed, Latch revealed that it would restate its financial statements for 2021 and the first quarter of 2022 due to revenue recognition errors related to the sale of hardware devices. In an 8-K, the Company stated:

> [B]ased on the preliminary findings of the Investigation, the Audit Committee determined that the Company's consolidated financial statements for 2021 included in the Company's Annual Report on Form 10-K for the year ended December 31, 2021 and associated report of the Company's independent registered public accounting firm, Deloitte & Touche LLP ("Deloitte"), as well as the Company's consolidated financial statements for the first quarter of 2022 included in the Company's Quarterly Report on Form 10-Q for the three months ended March 31, 2022, should no longer be relied upon as a result of material errors **and possible irregularities** relating to, among other things, the manner in which the Company recognized revenue associated with the sale of hardware devices during 2021 and the first quarter of 2022. Accordingly, the Audit Committee, in consultation with the Company's management, has determined that the Company's consolidated financial statements for 2021 and the first quarter of 2022 will be restated.

> Based on the preliminary findings of the Investigation, certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures. The Company's management is assessing the effect of the matters identified to date and the restatement on the Company's internal control over financial reporting and its disclosure controls and procedures. Although the assessment is not yet complete, the review is likely to result in one or more material weaknesses in the Company's internal control over financial reporting during the applicable periods.

142.    On this news, Latch's stock fell $0.13, or 12.2%, to close at $0.95 per share on August 26, 2022. As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

143.    Despite a disclosure vaguely reporting the results of a "preliminary" Investigation on August 25, 2022, however, Defendants have failed to restate their results or to disclose the results of the Audit Committee's Investigation into Latch's revenue recognition practices.

144.    In a Form NT 10-Q filed with the SEC on November 10, 2022, Latch stated that it could not file its quarterly report on Form 10-Q for the quarter ended September 30, 2022 because its Audit Committee's Investigation remained ongoing. Latch additionally disclosed that the Investigation had been expanded to include an investigation of the Company's financial statements for 2019 and 2020, as additional errors had been identified for those time periods. The filing stated that based on the preliminary findings of the Investigation, "certain revenue recognition errors occurred as a result of unreported sales arrangements due to sales activity that was inconsistent with the Company's internal controls and procedures.

145.    On November 16, 2022, Latch filed an 8-K with the SEC stating that on November 14, 2022 it received a notice from the Nasdaq Listing Qualifications Department, notifying the Company that it was not in compliance with the periodic filing requirements for continued listing set forth in Nasdaq Listing Rule 5250(c)(1) as a result of its failure to file its quarterly report on Form 10-Q for the quarter ended September 30, 2022. Following Latch's failure to file its quarterly report on Form 10-Q for the quarter ended June 30, 2022 previously, it had submitted a plan to regain compliance with the Rule, and Nasdaq granted an exception for the Company to regain compliance by filing the Quarterly Reports by February 6, 2023. This notice gave Latch until November 28, 2022 to submit an update to this compliance plan.

146.    On January 11, 2023, Latch announced the resignation of Defendant Schoenfelder as the Company's CEO and Chairman of the Board. The Board appointed Jason Keyes as interim CEO. Also on January 11, 2023, Defendant Schaefer resigned as Latch's Interim CFO.[5]

147.    On January 18, 2023, Latch disclosed in an 8-K that on January 11, 2023, it had received a written notice from the Nasdaq Listing Qualifications Department, notifying the Company that based on the closing bid price for the Company's common stock for the previous 30 consecutive trading days, Latch no longer met the minimum closing bid price requirement for continued listing on the Nasdaq Global Select Market. The Company would have a 180 day period to regain compliance, with the requirement that its stock trade at minimally $1 per share for a minimum of ten consecutive trading days prior to July 10, 2023.

148.    On January 23, 2023, Latch disclosed in an 8-K filed with the SEC, stating that based on the findings of its internal Investigation, the Audit Committee had determined that, in addition to the Company's consolidated financial statements for 2021 and the first quarter of 2022, the consolidated financial statements for 2019 and 2020 should also no longer be relied upon as a result of internal control deficiencies and errors relating to the manner in which the Company recognized revenue. Latch stated that the Investigation was now substantially complete, and that its management and Audit Committee had initiated a remediation process. The 8-K stated that the errors and issues included errors in the recognition of revenue for sales to various customers resulting primarily from (1) a failure of certain sales personnel in certain cases to disclose relevant terms they had negotiated with customers and a failure to identify, consider and properly account for such terms, (2) a failure to consider fully the impact of certain terms of sales agreements with

---

[5] Schaeffer himself had replaced Defendant Mitchell upon Mitchell's termination on March 29, 2022. Also on March 29, 2022, Ali Hussain, who spearheaded Latch's channel stuffing schemes, was demoted from his role as an executive officer and principal operating officer of the Company.

customers in determining the amount and timing of revenue to be recognized and (3) a failure to adequately assess collectability. The Investigation also identified errors in certain key performance indicators, including "bookings" and related metrics.

149.     As Defendants noted in their Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 63), after this disclosure that the Audit Committee Investigation was substantially complete, Latch's stock price increased. Investors bid up the price of Latch common stock, seeing a light at the end of the tunnel, the end of the Investigation, disclosing results, and a restatement.

150.     This disclosure, however, was materially false and misleading because Defendants knew and/or recklessly disregarded that despite stating that the Investigation was "substantively complete," meaning that investors could expect to receive its results shortly, over ten months later, Defendants have still failed to disclose its results. Either the results of the Investigation are either such that Defendants are withholding them from the market or the Investigation was not in fact complete on January 23, 2023. Defendants falsely led the market to believe that Latch would be able to complete the restatement and comply with Nasdaq listing requirements shortly.

151.     On February 13, 2023, Latch disclosed in an 8-K that on February 7, 2023, it had received a Staff Delisting Determination from the Listing Qualifications Department of Nasdaq notifying the Company that Nasdaq had initiated a process that could result in the delisting of Latch's securities from Nasdaq as a result of the Company not being in compliance with Nasdaq Listing Rule 5250(c)(1), which requires listed companies to timely file all required periodic financial reports with the SEC. Latch stated that it intended to appeal and seek a further stay of any suspension or delisting action. On February 28, 2023, the Nasdaq Hearings Panel notified

Latch that it was granting its request to extend the automatic stay of suspension from Nasdaq pending a hearing scheduled for March 23, 2023.

152.     On April 3, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2022. In this notification, Latch stated again that the Audit Committee's Investigation was substantially complete. It also disclosed that after appearing on March 23, 2023 before the Nasdaq Hearings Panel to appeal a determination by the Nasdaq Listing Qualifications Department to delist the Company's securities due to the Company's failure to timely file periodic reports, the Panel had not yet issued a decision.

153.     On April 11, 2023, Latch disclosed that it had received another notice from Nasdaq that it was not in compliance with the Listings Rule. In that notification, Latch disclosed the outcome of its March 23, 2023, appearance before the Nasdaq Hearings Panel. The Company stated that the Panel granted its request for continued listing on The Nasdaq Global Select Market, subject to the Company demonstrating compliance with the Listing Rule on or before August 4, 2023, and certain other conditions. Latch stated its intention to regain compliance with Nasdaq Listing Rule 5250(c)(1) by restating and becoming up to date with its periodic reports on or before August 4, 2023.

154.     On this news, Latch's stock price rose, closing at $0.6530 on April 12, 2023, up from a $0.6450 close on April 11, and then continuing to rise further over the subsequent weeks.

155.     On May 16, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2023. In that notification, Latch stated its intention to regain compliance with

Nasdaq Listing Rule 5250(c)(1) by restating and becoming up to date with its periodic reports on or before August 4, 2023.

156.    On June 15, 2023, Latch filed a form 8-K in which it stated, again, that it intended to regain compliance with Nasdaq Listing Rule 5250(c)(1) by restating and becoming up to date with its periodic reports on or before August 4, 2023, nearly twelve months after first disclosing "irregularities" and over six months after disclosing that the Audit Committee's investigation was substantially complete.

157.    On August 1, 2023, after the market closed, Latch filed an 8-K disclosing that on July 31, 2023, it had notified the Nasdaq hearings panel that the Company did not anticipate filing the financial reports that it had failed to file to regain compliance with Nasdaq Listing Rule 5250(c)(1) on or before August 4, 2023, which was its deadline. Accordingly, as Latch disclosed in an August 8, 2023, 8-K, on August 8, the Company received a notice from the Panel stating that it has determined to suspend trading of the Company's securities on August 10, 2023 and commence delisting procedures.

158.    On this news, Latch's stock fell sharply, dropping from a $1.68 per share closing price on August 1, 2023, to close at $0.91 per share on August 2, 2023.

159.    On August 15, 2023, Latch filed a notification of late filing with the SEC on Form 12b-25, stating that it was unable to file its quarterly report on Form 10-Q for the quarterly period ended June 30, 2023.

160.    On November 27, 2023, Latch filed an 8-K providing a restatement update. The Company stated that it was unable to provide an estimated timeframe for completion of the Restatement and filing of the delinquent reports, and that it did not anticipate completing the restatement or filing any of its delinquent financial reports by the end of 2023. It did not even

mention the supposedly substantially complete Audit Committee Investigation. Nearly sixteen months after Latch first disclosed that it could not file its quarterly report on Form 10-Q for the quarter ended June 30, 2022 because the Audit Committee had commenced an Investigation of alleged current and prior period matters, it appears that Latch is withholding the report of the Investigation as well as the restatement because it would demonstrate its culpability.

## V.   PLAINTIFF'S CLASS ACTION ALLEGATIONS

161.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all those who purchased or otherwise acquired the publicly traded common stock of Latch during the Class Period, and who were damaged thereby. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

162.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock actively traded on Nasdaq. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

163.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

165.    Common questions of law and fact exist as to all members of the Class predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a.      whether Defendants' acts as alleged violated the federal securities laws;

b.      whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

c.      whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.      whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

e.      whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f.      whether the prices of the Company's common stock during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

g.      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

166.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.   APPLICATION OF PRESUMPTION OF RELIANCE; FRAUD ON THE MARKET

167.   Plaintiff will rely on the presumption of reliance established by the fraud on the market doctrine. At all relevant times, the market for Latch's common stock was open, well-developed, and efficient. As a result of the materially false and/or misleading statements and/or failures to disclose, Latch's common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon the integrity of the market price of Latch's common stock and market information relating to Latch, and have been damaged thereby.

168.   During the Class Period, the artificial inflation of Latch's stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Latch's business, operations, and revenue. These material misstatements and/or omissions created an unrealistically positive assessment of Latch and its business, operations, and revenue, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

169.   At all relevant times, the market for Latch's common stock was an efficient market for the following reasons, among others:

a.   Latch common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b.   As a regulated issuer, Latch filed periodic public reports with the SEC and/or the Nasdaq;

c.   Latch regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

d.   Latch was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

e.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

170.   As a result of the foregoing, the market for Latch's common stock promptly digested current information regarding Latch from all publicly available sources and reflected such information in Latch's stock price. Under these circumstances, all purchasers of Latch's common stock during the Class Period suffered similar injury through their purchase of Latch's common stock at artificially inflated prices and a presumption of reliance applies.

171.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial results and prospects— information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## VII.    COUNTS

### COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

172.    Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

173.    This Count is asserted against each of the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

174.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Latch's common stock at artificially inflated prices. In

furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

175.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Latch's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

176.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Latch's business operations and financial results and prospects, as specified herein.

177.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Latch's revenue, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Latch and its business operations and financial results and prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

178.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's revenue recognition practices, financial results, and reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

179.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Latch's actual business operation practices and revenues from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's revenues and business operations throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

180.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Latch's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Latch's common stock during the Class Period at artificially high prices and were damaged thereby.

181.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Latch's revenue recognition practices and its overstatement of revenue in its financial reports, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Latch common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

182.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

183.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

184.     The Individual Defendants acted as controlling persons of Latch within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their participation in and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

185.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the revenue recognition practices giving rise to the securities violations as alleged herein, and exercised the same.

186.     As set forth above, Latch and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## IX.   DEMAND FOR TRIAL BY JURY

187.    Plaintiff hereby demands a trial by jury.

Dated: December 5, 2023                     Respectfully submitted,

                                            **THE ROSEN LAW FIRM, P.A.**


                                            By: /s/ *Jacob A. Goldberg*
                                            Jacob A. Goldberg
                                            Leah Heifetz-Li
                                            101 Greenwood Avenue
                                            Suite 440
                                            Jenkintown, PA 19046
                                            Tel: (215) 600-2817
                                            Fax: (212) 202-3827
                                            Email: jgoldberg@rosenlegal.com
                                                   lheifetz@rosenlegal.com

                                            *Lead Counsel for Lead Plaintiff and the Class*