**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SLATER BRENNAN, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>LATCH, INC. f/k/a TS INNOVATION ACQUISITIONS CORP., LUKE SCHOENFELDER, GARTH MITCHELL, and BARRY SCHAEFFER,<br><br>    Defendants. | Case No. 1:22-cv-07473-JGK<br><br>JURY TRIAL DEMANDED |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT .................................................................................... 1

II. STATEMENT OF FACTS ......................................................................................... 1

    A.  Latch's Business and Financial Reporting ........................................................... 1

    B.  Latch Improperly Recognized Revenue and Inflated Hardware Bookings ....................... 2

    C.  Defendants Misled Investors About Revenue and Bookings ................................. 4

    D.  Latch Has Failed to Restate or Release the Results of the Investigation ........................... 5

    E.  Defendants Violated GAAP and Misled Using Non-GAAP Financial Measures ............. 5

    F.  Latch's Internal Control Problems Were a Product of the Tone at the Top ...................... 6

III. ARGUMENT ........................................................................................................ 6

    A.  Legal Standard ............................................................................................ 6

    B.  Defendants Materially Misled Investors ............................................................ 7

        1.  Defendants Materially Misstated Latch Revenue .......................................... 7

        2.  CWs Support Material Falsity of Bookings ................................................. 9

        3.  Defendants Did Not Disclose Improperly Recognized Revenue as "Channel Partner Fees" ........................................................................... 10

        4.  The CWs Particularize Undisclosed Channel Stuffing ................................. 10

        5.  The Complaint Details Undisclosed Consignment Sales .............................. 11

        6.  Defendants Misled Investors About Latch's Internal Controls ..................... 11

        7.  No Challenged Statements are Forward Looking ....................................... 13

        8.  Plaintiff Pleads a Violation of Item 303 .................................................. 14

        9.  Plaintiff Has Standing to Challenge Revenue Statements in the Prospectus ............. 14

    C.  The Complaint Adequately Pleads Scienter as to All Defendants ................................... 15

        1.  The Complaint Pleads Defendants' Motive and Opportunity ........................ 16

        2.  The Complaint Pleads Strong Circumstantial Evidence of Scienter ............... 18

D.  The Complaint Sufficiently Pleads Loss Causation........................................................... 24

E.  The Complaint Adequately Pleads Control Person Liability............................................ 25

IV. CONCLUSION........................................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abramson v. Newlink Genetics Corp.*,
    965 F.3d 165 (2d Cir. 2020).................................................................................. 8, 24

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995)........................................................................................ 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).............................................................................................. 6, 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..................................................................................................... 6

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020)................................................................. 21, 23

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017)............................................................... passim

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................... 24

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ............................................................................... 20

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)......................................................... 11

*Handal v. Tenet Fintech Group Inc.*,
    2023 WL 6214109 (E.D.N.Y. Sept. 25, 2023) ........................................................ 22

*In re Campbell Soup Co. Sec. Litig.*,
    145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................... 16

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009)....................................................................................... 6

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)...................................................................... 20

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
    20 F.4th 131 (2d Cir. 2021) ............................................................................... 16, 18

iii

*In re Royal Caribbean Cruises Ltd. Sec. Litig.*,
   2013 WL 3295951 (S.D. Fla. Apr. 19, 2013) ..................................................... 13

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015).................................................................. 13

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)................................................................................ 21

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..................................................... 24

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)............................................................................... 24

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
   14 F.4th 141 (2d Cir. 2021) ................................................................................. 6

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)............................................................................... 18

*Kelleher v. ADVO, INC.*,
   2008 WL 11376597 (D. Conn. Apr. 28, 2008) .................................................. 15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015)................................................................... 21, 23, 24

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
   54 F.4th 82 (2d Cir. 2022) ................................................................................. 14

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014)............................................................................... 12

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ................................................................................. 8

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)................................................................... 6, 10, 22

*P. Stolz Fam. P'ship L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004)................................................................................ 13

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015)................................................................ 7, 22

*Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*,
   2011 WL 1198712 (S.D.N.Y. Mar. 30, 2011) .................................................... 23

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ........................................................... 12

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................................................ 12

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011) ............................................................. 15, 16

*Stratte-McClure v. Morgan Stanley*,
    776 F.3d 94 (2d Cir. 2015) ........................................................................... 12, 14

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) ................................................................................ 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ..................................................................................... 15, 18

*U.S. S.E.C. v. Meltzer*,
    440 F. Supp. 2d 179 (E.D.N.Y. 2006) ................................................................ 13

*Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
    886 F. Supp. 2d 328 (S.D.N.Y. 2012) ................................................................. 9

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009) ............................................................. 7, 12

Statutes

15 U.S.C. § 78t(a) ....................................................................................................... 25

15 U.S.C. § 78u-4(b)(1) and (b)(2) .............................................................................. 6

15 U.S.C. § 78u-4(b)(1)(e) ......................................................................................... 10

Rules

Fed. R. Civ. P. 15(a) ................................................................................................... 25

Regulations

17 C.F.R. § 244.100(b) ............................................................................................... 14

Lead Plaintiff VP PTC Establishment as Trustee of Gersec Trust ("Plaintiff") opposes Defendants' motion to dismiss ("Motion") the Second Amended Class Action Complaint ("Complaint") (Dkt. No. 69).[1]

## I.    PRELIMINARY STATEMENT

In 2017, this Court denied a motion to dismiss in *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 546 (S.D.N.Y. 2017). This case is on all fours with *comScore*, and the Court should deny Defendants' motion to dismiss. With intent or reckless disregard, Defendants lied to investors, materially overstating revenue in violation of GAAP[2] and misleading investors concerning the Company's internal controls as well as key non-GAAP business metrics.

## II.    STATEMENT OF FACTS

### A.    Latch's Business and Financial Reporting

Latch claims "a full building operating system, LatchOS, that . . . streamlin[es] building operations, enhance[es] the resident experience, and enabl[es] more efficient interactions with service providers." ¶25. In reality, however, Latch is a hardware company, selling "doormounted access control products" and "intercom systems." ¶27. In mid-2021, hardware sales were at least 80% of Latch's revenue. ¶32. Latch went public on June 4, 2021, through a "Business Combination" with TSIA, a publicly traded special purpose acquisition company ("SPAC"). ¶24.

On May 13, 2021, TSIA filed with the SEC a proxy statement/prospectus ("Prospectus"), describing Latch in detail. *Id.* Latch had and has never been profitable. As a result, investors

---

[1] "Individual Defendants" are ex-CEO Schoenfelder, ¶20, ex-CFO Mitchell, ¶21, and ex-CFO Schaeffer, ¶22, and together with Latch Inc. ("Latch" or "Company"), "Defendants." Citations to the Complaint are "¶__." Citation to Defendants' Memorandum of Law in support of their Motion to Dismiss are "Br.__."

[2] "GAAP" are generally accepted accounting principles.

measured Latch's progress towards profitability by its revenue. ¶28. Latch also reported a non-GAAP measure of future revenues, reporting "Hardware Bookings." *Id*. The Prospectus included Latch's key performance indicators, principally revenue and Hardware Bookings. ¶29.

Latch sells hardware through its channel partners, stating "[w]e recognize hardware revenue when the hardware is shipped to our channel partners, which is when control is transferred to the building developer." ¶30. According to Latch's 2021 10-K, ¶32, Latch hardware customers signed non-binding Letters of Intent ("LOIs") to purchase products, and Latch disclosed these publicly as Hardware Bookings. Both the Prospectus and the 2021 10-K reflect that bookings did not reflect discounts, but that Latch based them on "historical experience" providing "sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target date delivery date no longer than 24 months following LOI signature." *Id*.; *see also* ¶33.

### B.    Latch Improperly Recognized Revenue and Inflated Hardware Bookings

On August 12, 2022, Latch disclosed that it would not timely file its 2Q 2022 quarterly report, jeopardizing its NASDAQ listing. On this news, Latch common stock fell by 18.5%. ¶140. On August 25, 2022, Latch disclosed preliminary findings of its Audit Committee's investigation ("Investigation"), warning of a restatement and that investors should no longer rely on its 2021 and Q1 2022 financial statements "as a result of material errors and possible irregularities." ¶141. Latch's stock fell 12.2%. ¶142. On January 23, 2023, Latch disclosed that, based on the results of the substantially complete Investigation, it would also restate 2019 and 2020 financial statements, blaming internal control deficiencies and errors relating to revenue recognition. ¶148.

Seventeen months later, Latch has yet to release the results of the Investigation or the restatement. ¶¶3, 160. Four former Latch senior sales employees,[3] however, detail Latch's

---

[3] Confidential Witness 1 ("CW1") started as a Channel Executive, becoming Regional Vice President of Channel

improper revenue recognition and internal control weaknesses. CW2 explains that Latch carried out a scheme to inflate revenue artificially, selling hardware to channel partners at one price but recognizing revenue at the channel partner's materially higher sale price to the end-user, not the price the channel partner paid to Latch. ¶42. CW2 raised this issue to several employees in the CFO function, but they rebuffed him. *Id.* Defendants have admitted this practice, describing the difference as "channel partner fees" that were recorded as a "cost of revenue." ¶43; Br.5-6. Under GAAP, however, the cost of sales are only those directly related to creating products. Because "channel partner fees" are unrelated to creating hardware, Defendants both corroborate CW2 and admit they materially and improperly inflated revenue, ¶45, a key metric. ¶¶45-47.

CW2 also described the Latch Preferred Partner Program ("LLP"), through which Latch channel stuffed hardware. ¶48. Latch shipped hardware to its channel partners without an end-purchaser, improperly recognizing the revenue immediately. When channel partners received actual orders, Latch prohibited them from deploying on-hand inventory, instead shipping new hardware and recognizing more revenue. Partners maintained shelves full of hardware. *Id.*

CW3 witnessed similar channel stuffing in 2018 and 2019 and expressed his concern directly to Defendant Mitchell and other executives. Mitchell told him that as a startup, Latch had to take risks. Unable to influence change, CW3 left Latch. ¶¶49-50. CW3 returned in 2021, receiving assurances that Latch had cleaned up its business practices because it was going public. After returning, however, corroborating CW2, CW3 learned about LPP. On sales planning calls,

---

Sales during the Class Period; Confidential Witness 2 ("CW2") was vice president of channel development during the Class Period; Confidential Witness 3 ("CW3"), was director of national channel partnerships and field sales from January 2018 until July 2019, returning as a senior solutions engineer from July 2021 until March 2022; Confidential Witness 4 ("CW4") was vice president of sales North America from February 2020 until June 2022 (¶¶35-38).

CW3 heard management urge sales staff to convince dealers to take early delivery of hardware. ¶51. CW3 recalls a consignment arrangement with channel partner Whiz Cribs, beginning in summer 2019 and continuing after CW3's June 2021 return. Latch lent Whiz Cribs cash in return for which Whiz Cribs held large amounts of Latch hardware that it did not sell. According to CW3, Latch immediately recognized these consignment sales to Whiz Cribs on shipment, and Defendant Mitchell was personally involved in that wrongdoing. ¶52.[4]

CW4 also saw Latch management routinely recognize revenue upon sending hardware to channel partner warehouses without end-purchasers. CW4 recalled that Latch offered channel partners discounts to take products and keep them on their shelves. In CW4's experience, only 60 to 70% of Latch's recognized North America revenue represented shipped product, and only 30 to 40% was actual, properly recognized revenue. ¶54. More, CW4 saw Latch recognize revenue from transfers ***to itself,*** shipping hardware to a distribution warehouse Latch controlled and claiming the transfer as revenue without any evidence of transfer to a bona fide buyer. ¶55.

More, CWs recall that Latch misrepresented its Hardware Bookings. Even as Latch told investors that Hardware Bookings were reasonably certain to result in sales within 24 months, ¶32, according to CW1, their conversion rate into revenue was only 15% to 25%. ¶39. In CW3's experience, only approximately 10% of LOIs converted into sales. ¶41.

### C.    Defendants Misled Investors About Revenue and Bookings

Throughout the Class Period, Latch materially misrepresented revenue and non-GAAP EBITDA and bookings for FY[5] 2019 and FY 2020, ¶¶109-112, Q1[6] 2021, ¶¶115-118, Q2 2021,

---

[4] Latch terminated Mitchell on March 29, 2022. ¶146.

[5] "FY" is fiscal year.

[6] "Q__" refers to a fiscal quarter.

¶¶119-122, Q3 2001, ¶¶124-127, FY 2021, ¶¶128-131, and Q1 2022. ¶¶134-138. The Prospectus and the period disclosures during the Class Period also omitted that Latch lacked internal controls over financial reporting relating to revenue recognition and bookings. *See e.g.*, ¶¶113-14, 122, 126. The August 13, 2021, 10-Q also concealed that Latch released the reserve for wholesale returns it had accumulated as a private company to meet its first revenue target as a public company. ¶123.

Latch's 2021 10-K also misrepresented Latch's revenue recognition practices, falsely stating that the Company recognized revenue when control over its products transferred when in fact it routinely recognized revenue on hardware that it shipped to channel partners' facilities without an actual change in control and/or without recording an allowance for returns, on the basis of incorrect sales prices, and from consignment sales. ¶¶132-133.

### D.    Latch Has Failed to Restate or Release the Results of the Investigation

For over seventeen months Latch has failed both to restate and to disclose the results of the Investigation. For this reason, the Complaint pleads the fact of material falsity without quantifying it. On April 11, 2023, under threat of Nasdaq delisting, Latch disclosed that it would restate by August 4, 2023. ¶153. In response, Latch's stock rose. ¶154. On August 1, 2023, Latch disclosed that it would not restate by August 4, 2023, and that Nasdaq would suspend it from trading on August 10, 2023. ¶157. On this news, Latch's stock fell 12.2%. ¶158.

### E.    Defendants Violated GAAP and Misled Using Non-GAAP Financial Measures

Latch admits violating GAAP. The Complaint particularizes allegations of channel stuffing, through which Latch recognized revenue on shipments to channel partners who had no current need for the product and/or ability to sell. ¶¶65-72.

Latch also inaccurately reported Hardware Bookings. Latch's filings disclosed that its bookings, which represented purported revenue commitments, were "not reflecting discounts."

But Latch granted material discounts to its channel partners and was required to reduce its revenues in recognition of discounts and future returns of excess inventory. Thus, Latch's disclosures of its Hardware Bookings reflected inflation of both transaction prices and volume. ¶86.

### F. Latch's Internal Control Problems Were a Product of the Tone at the Top

Even as they disclosed other, unrelated internal control problems, Defendants omitted that the Company lacked internal controls over financial reporting, particularly over revenue recognition and reporting of key non-GAAP performance indicators due to intentionally artificially inflating revenues and Hardware Bookings. *See, e.g.,* ¶96. As the CWs described, Latch's "tone at the top," ¶103, encouraged sales personnel to find channel stuffing opportunities and dismissed employee concerns about unsustainable business practices as necessary risks. ¶107.

## III. ARGUMENT

### A. Legal Standard

In ruling on a motion to dismiss under Rule 12(b)(6), a court accepts all well-pleaded allegations as true, drawing reasonable inference in favor of plaintiffs. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 692 (2d Cir. 2009); *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145, 147 (2d Cir. 2021). A complaint should not be dismissed if the plaintiffs have stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff[s] plead[ ] factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") further requires that a §10(b) claim must "'specify'" each false statement, explain "'the reason or reasons why the statement [was] misleading,'" and "'state with particularity facts giving rise to a strong inference'" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306–07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-

4(b)(1) and (b)(2)). Plaintiff adequately pleads all the elements of a §10(b) claim.

**B.    Defendants Materially Misled Investors**

**1.    Defendants Materially Misstated Latch Revenue**

Defendants effectively admit material falsity. While a restatement, itself, is insufficient to plead scienter, it suffices to plead that financial statements were false when issued. *comScore*, 268 F.Supp.3d at 544-45 (restatement means "there can be no dispute that the SAC pleads numerous false and misleading misstatements with respect to revenue, revenue related metrics, and comScore's compliance with GAAP"); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618 (S.D.N.Y. 2015) (restatement pleads material falsity); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606 (S.D.N.Y. 2009) (same). GAAP supports this conclusion, mandating that a restatement occurs only when material errors existed at the time Defendants prepared financial statements. ¶¶87-88. In August 2022 and January 2023, Latch admitted material errors and possible irregularities with respect to revenue recognition in its financials for 2019 through the first quarter of 2022. ¶¶141, 148. As this Court wrote, "'the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made.'" *comScore*, 268 F. Supp. 3d at 544 (citation omitted) (rejecting defendants' attempt to conflate materiality falsity with fraudulent intent). Thus, as in *comScore*, Latch has admitted the material falsity of its financial statements. ¶¶141, 148.[7]

Defendants' argument about the "inherently subjective nature" of some accounting judgments, Br.10, may apply to scienter but is meaningless in the falsity context. Of course, there

---

[7] Defendants appear to assert that the Complaint is premature. Br.11-12. If they seek more time to disclose the Investigation results and restatement, they should tell the Court with precision when and seek a stay. Otherwise, their suggestion portends no restatement, ever. In any event, the Complaint already pleads material falsity.

is nothing subjective about purposefully, materially inflating the price at which one books revenue, but even assuming the accounting for revenue required some judgment, the necessity of a restatement means Latch's financial statements were materially false when made—that any such judgment was wrong. Defendants' citation to *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 173–74 (2d Cir. 2023) is a red herring. *DeCarlo* does not render GAAP financial statements opinions even as in some instances, GAAP requires fact-based judgment.[8] A restatement admits material falsity at the time of disclosure, ¶¶87-95, not that in making a judgment "some fact cut[s] the other way." More, according to Latch, it will restate because sales personnel failed to report relevant sales terms, management failed to consider the impact of sales terms when booking revenue, and management failed "to adequately assess collectability." ¶148. Latch, therefore, concedes that the restatement has nothing to do with judgment. Then existing, objective facts belied the revenue Latch actually booked.[9]

---

[8] Defendants misapprehend Second Circuit law on the actionable falsity of an opinion, stating courts find actionable falsity only if an opinion is incorrect and not genuinely believed. Br.10. This is wrong. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) (reversing in part dismissal because "*Omnicare* rejected the proposition that there can be no liability based on a statement of opinion unless the speaker disbelieved the opinion at the time it was made"). *Omnicare*, establishes three ways to show an opinion's falsity: (1) disbelief; (2) a disclosed fact relating to the opinion is false; or (3) omitting implied critical context that undermines the opinion. *Id.* at 175.

[9] Similarly, with respect to non-GAAP measures, while bookings may be an opinion, disclosing that history shows a "reasonable certainty" of customers' intent to close within 24 months of an LOI, ¶32, when actual closings did not exceed 30%. ¶¶39, 41. Again, the difference is not "some fact cutting the other way" but wholly undermines the opinion expressed.

Last, Defendants' invocation of "strict liability," Br.11, fails. Material falsity is but one element of a Rule 10b-5 claim. The Complaint must still adequately plead scienter. Br.19.[10] On the basis of Defendants' own admissions,  ¶¶141, 148, the Complaint pleads that Latch materially overstated revenue and Hardware Bookings.

### 2.    CWs Support Material Falsity of Bookings

CWs add specificity to Latch's admission of inflated Hardware Bookings. CW1 and CW3, through the nature of their roles, knew the relationship between LOIs and conversion into actual sales firsthand. ¶¶39, 41. They witnessed actual conversion rates of LOIs from bookings into actual purchase orders between 10% and 25%, which contradicts how Defendants disclosed the potential of revenue from bookings ("based on historical experience we believe there is sufficient or reasonable certainty about the customers' ability and intent to fulfill these commitments with a target date delivery date no longer than 24 months following LOI signature."). ¶30.

Defendants' argument that Plaintiff does not "show how or why Latch violated ASC 606 by not accounting for discounts in its reporting of bookings" makes no sense because, as Defendants acknowledge, bookings is a "non-GAAP metric." Br.13. Thus, ASC 606 does not apply to bookings disclosures. That does not excuse Defendants from describing this Key Business Metric with material accuracy. More, even as Defendants disclosed that they excluded discounts, **when discounts are significant,** as the CWs describe, disclosure that they are not included in

---

[10] *Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328 (S.D.N.Y. 2012) is inapposite, finding the errors immaterial either for having no impact or a positive impact on financial results. *Id.* at 336. Even as the Audit Committee substantially completed the Investigation a year ago, ¶148— the only reasonable inference is that Latch has the results—Defendants do not assert that the impact of the restatement on revenue will be positive or immaterial.

reported bookings is not sufficient. There must be disclosure of the magnitude of the omitted discounts to keep the non-GAAP financial disclosure from being misleading. ¶85.

### 3. Defendants Did Not Disclose Improperly Recognized Revenue as "Channel Partner Fees"

Defendants argue that they disclosed Latch's improper practice of recognizing revenue at its channel partners' sales prices, maintaining that what they called "channel partner fees" were recorded as a "cost of revenue" comprised of "discretion[ary]" payments to channel partners for "carry[ing] out installation and service at customer buildings," and ranged "from 20% to 40% of the sales price of the hardware." Br.13-14, 5-6; ¶43.[11] But the disclosure that "we pay the channel partners a fee at our discretion based on a standard price list" fees that "generally range from 20% to 40% of the sales price of the hardware," (DEx. 2, 133-134), describes Latch's business relationship with its channel partners, not how it recognizes revenue for hardware sold through them. More, the Complaint details how this practice misled investors: it allowed Latch to make its revenues, a key business metric, look higher by accounting for this difference in net loss, which was not a key metric. ¶¶45-47. *See Novak*, 216 F.3d at 307 (citing 15 U.S.C. § 78u-4(b)(1)(e) (omissions of material fact necessary to make the statements made not misleading plead falsity).

### 4. The CWs Particularize Undisclosed Channel Stuffing

Defendants' arguments that the Complaint does not plead undisclosed channel stuffing ignore or mischaracterize Plaintiff's well-pled allegations. *See* Br.14. CW3 witnessed channel stuffing in 2018 and 2019, and again in 2021 and 2022. ¶¶51-52. The channel stuffing described by CW2, CW3, and CW4 (¶55) was used to develop revenue that was used in the financial

---

[11] Defendants appear to consider these a cost of sales, but those are only those costs that are directly related to creating the products that an entity sells. ¶45.

statements that Latch has stated it will restate. The impact of channel stuffing on the revenue that Latch has admitted materially misstating differentiates this case from *Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *18 (S.D.N.Y. Sept. 30, 2004), *see* Br.15, in which there was no restatement and thus no relation of a specific accounting practice identified by former employees to a restatement. The Complaint pleads personal knowledge of channel stuffing by these CWs. *See, e.g.,* ¶51.[12]

### 5.    The Complaint Details Undisclosed Consignment Sales

Defendants' argument that the Complaint does not plead undisclosed consignment sales because granting a right of return is not fraudulent unless it is undisclosed is a red herring. *See* Br.15. A consignment sale is not the same as a sale with a right of return. ¶80. Defendants' disclosure that "The Company also provides certain customers a wholesale arrangement with a right of return for non-defective product[]" that Defendants cite (DEx. 1 at 75), does not describe the existence of consignment sales such as the arrangement with Whiz Cribs. ¶52.

### 6.    Defendants Misled Investors About Latch's Internal Controls

The Complaint sufficiently pleads that Defendants materially misled Latch investors concerning the Company's internal controls over financial reporting. Defendants' argument that Plaintiff "faults Defendants for not providing *more* information about the disclosed weaknesses" falls flat. The Complaint does not question whether the disclosed weaknesses existed or not, but rather alleges numerous ***additional, undisclosed*** weaknesses. *See, e.g.,* ¶114.

With respect to Defendants' statements regarding internal controls, Plaintiff sufficiently

---

[12] The Complaint does not concede that Latch "cleaned up" before going public but pleads only that CRO Chris Lee told CW3 it had to entice him to rejoin. ¶51. Defendants have admitted the persistence of the same wrongdoing from 2019 through Q12022, ¶148, belying Chris Lee's representation to CW3 who recognized the LPP as the same wrongdoing in which Latch had engaged in 2019. ¶51.

alleges false or misleading statements by identifying Defendants' statements concerning internal controls and explaining why they were fraudulent. *See Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Even as they disclosed some material weaknesses, Defendants completely omitted that Latch lacked internal controls over financial reporting due to its practices of improperly recognizing revenue and intentionally inflating Hardware Bookings. These practices, which Defendant Mitchell personally approved, ¶¶50, 52, and which the Court is obliged to accept occurred, *see Iqbal*, 556 U.S. 662, raise the inference that Latch had far more internal control problems than it disclosed. *Varghese*, 672 F. Supp. 2d at 607; *comScore*, 268 F.Supp.3d at 548-49.

Rok v. Identiv, Inc.*, 2017 WL 35496, at *7 (N.D. Cal. Jan. 4, 2017), is inapposite. Plaintiff's claim that Defendants misled investors concerning Latch's internal controls does not depend on the incompleteness of its disclosure, but its falsity. Even if Latch had never made any disclosure of a remediation process to address internal control weaknesses relating to "(a) Latch's general segregation of duties, including the review and approval of journal entries; (b) the lack of a formalized risk assessment process; and (c) selection and development of control activities, including over information technology," ¶113, its failure to disclose its improper revenue recognition and inflation of Hardware Bookings would be actionable. More, the idea that this disclosure can sanitize Defendants' omission is inconsistent with Second Circuit law, which holds that "a duty [to disclose omitted facts] may arise when there is ... a corporate statement that would otherwise be inaccurate, incomplete, or misleading." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (omitting failures to prevent regulatory violations rendered comforting statements in a prospectus about compliance measures misleading). False

statements about internal controls are not somehow exempt from this Second Circuit principle.

### 7.    No Challenged Statements are Forward Looking

Defendants' argument that its bookings reports are protected by the PSLRA's safe harbor makes no sense. While Hardware Bookings gave investors a glimpse into potential future revenues, ¶28, they were also Key Business Metrics reflecting then-current information, ¶29. Defendants developed this metric on the basis of LOIs that they knew *at the time* were converting into actual purchase orders only between 10% and 25% of the time. ¶¶39, 41. *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015), holding that statements about the likelihood of FDA approval were forward looking, is inapplicable to a financial metric that Latch reported in past and present terms. *See, e.g.,* ¶29. More, the bespeaks caution doctrine is inapplicable where, as here, defendants knew the statement was false. *P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) (bespeaks caution doctrine inapplicable when risk warned of had already occurred); *U.S. S.E.C. v. Meltzer*, 440 F. Supp. 2d 179, 191–92 (E.D.N.Y. 2006) (knowing falsity at time of statement eliminates application of bespeaks caution doctrine).

Latch's disclosures of its Hardware Bookings were based on artificially inflated transaction prices and reflected intentionally inflated volume. ¶86. More, as in *comScore,* the risk factors did not warn investors about the relevant risk that led to the restatement: improper accounting and misconduct by management. *comScore,* 268 F.Supp.3d at 548 (also noting that "resort to cautionary language cannot aid the 10(b) defendants in light of the plausible allegations that the 10(b) defendants knew at the time that a significant portion of the revenue undergirding their revenue projections was fictitious."). By contrast, in *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, 2013 WL 3295951, at *15 (S.D. Fla. Apr. 19, 2013), where the Court held that cruise bookings were forward looking, there was no indication of intentional inflation or knowledge that bookings were turning into sales at a materially lower rate than the Company's disclosures suggested.

### 8. Plaintiff Pleads a Violation of Item 303

Plaintiff pleads that Defendants violated Item 303 by engaging in channel stuffing. Second Circuit law is clear that Item 303 obligates an issuer to disclose when "'a . . . commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial conditions or results of operations.'" *Stratte-McClure*, 776 F.3d at 101 (2d Cir. 2015. The Complaint pleads that Latch management was personally involved in channel stuffing, ¶¶49-50—robbing Peter to pay Paul—and knew that it would impact future sales, including those Hardware Bookings reflected. Admitting the need to restate concedes the materiality of Latch's channel stuffing.[13]

### 9. Plaintiff Has Standing to Challenge Revenue Statements in the Prospectus

Defendants' argument that Plaintiff has no standing to challenge statements Latch made before June 4, 2021, is meritless. In *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86 (2d Cir. 2022), the Second Circuit held that shareholders in private Latch could not sue for statements issued after the Business Combination, not that shareholders of public Latch cannot sue for statements after Latch went public such as its June 9, 2021, first quarter 2021 financial results.

More, it is undisputable that after June 7, 2021, Defendants had a duty not to mislead Latch investors. Thus, after Latch completed the Business Combination, its officers were duty bound to

---

[13] More, Rule 100(b) of Regulation G precluded Defendants from disclosing any non-GAAP financial measure that contained an untrue statement of a material fact or omitted to state a material fact necessary to make the presentation thereof, in light of the circumstances under which it is presented, not misleading. 17 C.F.R. § 244.100(b); ¶85. Disclosing that its bookings did "not reflect[] discounts," Latch granted significant channel partners discounts, requiring reduction of revenues because of discounts and future returns of excess inventory. Thus, Latch's disclosures of its bookings violated Reg G for inflating both transaction prices and volume of Hardware Bookings. ¶86.

purchasers of Latch common stock on or after June 7, 2021, to correct any false statements Defendants had provided to TSIA for inclusion in the Prospectus. They did not, rendering them liable from the opening of trading on June 7, 2021, for false and misleading statements in the Prospectus. ¶108. *See Kelleher v. ADVO, INC.*, 2008 WL 11376597, at *2 (D. Conn. Apr. 28, 2008) (defendants were liable for failing to correct prior false statements).

### C.    The Complaint Adequately Pleads Scienter as to All Defendants

A complaint adequately pleads scienter when it alleges (i) facts showing that a defendant had "both motive and opportunity to commit the fraud," or (ii) facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *comScore*, 268 F. Supp. 3d at 550 (citation omitted). To determine the adequacy of a complaint's scienter allegations, courts engage in a comparative analysis. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323–24 (2007) (citation omitted). Courts consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323 (emphasis in original). Considering "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff" courts determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Importantly, a strong inference "need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences. *Id.* (citations omitted).

The absence of motive, while relevant, "is not fatal[.]"*Tellabs*, 551 U.S. at 325 (citation omitted). Indeed, "the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.*[14] Recently, the Second Circuit clarified that while

---

[14] Defendants misquote *Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011). DBr.19-20. *Russo* holds that more

independent bases exist for pleading scienter, it is error not "to assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021) (emphasis in original). Thus, even if allegations of motive fail, alone, to establish a strong inference, courts must include those allegations in their holistic analysis of scienter allegations. Here, the allegations of the Complaint, considered together, support a strong inference of scienter for each defendant.

### 1.    The Complaint Pleads Defendants' Motive and Opportunity

Conceding that they had opportunity,[15] Defendants assert that the Complaint fails to plead motive. Br.19-20. They ignore, however, the motive allegations in plain view, which support a cogent and at least equally compelling scienter inference.

While context is key, this Court has held that falsifying revenue to enhance the prospects for a business combination supports motive. *comScore*, 268 F. Supp. 3d 554. Defendants' lies involve several schemes to artificially materially increase revenue. Because Latch was *ex* profit, investors evaluated it based in material part on its revenue. ¶¶28, 46. Defendants do not argue that the Complaint fails adequately to plead their knowing or reckless falsification of revenue and Hardware Bookings before the Class Period leading up to the Business Combination. Br.20 (no

---

than stock sales may suffice to show motive but not all stock sales support motive. *Id.* at 517–20. In *Russo*, the court held that, given the complaint's failure to implicate an outside director in fraud, his one trade "fatally undermines *the motive allegations* premised on [his] lone sale." *Id.* (citation omitted) (emphasis added). Failure to allege stock sales, alone, is fatal to neither motive allegations nor "Plaintiff's scienter allegations." The Court should not countenance misquoting cases. *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 588 n.1 (D.N.J. 2001) ("Misquoting cases is not acceptable in the Southern District of New York nor is it acceptable in the District of New Jersey").

[15] *See*, *e.g. comScore*, 268 F. Supp. 3d at 553-54 (no disputed that high-ranking officers have opportunity).

interaction with Defendants "during the Class Period" but ignoring earlier allegations). Their schemes relate directly to their attempt to execute the Business Combination. ¶4. For example, in valuing Latch, among the tools TSIA applied were ratios of enterprise value to revenue.[16] This Court has found substantially similar allegations to support motive. In *comScore*, the defendants inflated revenue to increase the company's valuation and stock price, enabling it to acquire a target using fewer shares of its own stock. *comScore*, 268 F. Supp. 3d at 554 (establishing direct line between merger and fraud supports motive allegations). Here, Defendants were motivated to materially inflated revenue to secure a vital Business Combination with a SPAC flush with cash.

More, evidence of pecuniary gain also supports motive allegations. *See, e.g., comScore*, 268 F. Supp. 3d at 555 (finding that the magnitude of profits earned from insider sales supported scienter). As a result of the Business Combination, Latch, a private company with $60.5 million in cash and a shareholder deficit of $89.6 million as of December 31, 2020,[17] became a cash rich company, reporting nearly $472 million in cash and cash equivalents as of June 30, 2021. ¶4.[18] Context is key: while Defendants aspired for Latch to be a comprehensive software solution for building management, that was aspirational. ¶¶25-27. To realize its aspiration, it required a cash infusion, and the Business Combination provided it.

Not only did Latch, itself, achieve material pecuniary gain, but so did Individual Defendants and others whose scienter the Court will impute to Latch. The value of Defendants' personal holdings and the holdings of former COO Hussain in private Latch were all but illiquid. After the Business Combination, these holdings became publicly tradeable, unlocking value.

---

[16] *See* Heifetz-Li Decl. Ex. 1, at 194.

[17] *See* Heifetz-Li Decl. Ex. 1, at F-24.

[18] *See* Heifetz-Li Decl. Ex. 2, at 1.

While the Individual Defendants' shares where subject to a Lock-Up, that restriction was subject to a "Registration Rights Agreement."[19] Schoenfelder, Mitchell, and Hussain each were sellers in a July 8, 2021, offering.[20] Schoenfelder alone sold 1,175,907 shares.[21] The inference the Business Combination motivated their knowing or reckless falsification of revenue and bookings is cogent and at least as compelling as Defendants' contention that they were negligent. *comScore*, 268 F. Supp. 3d at 554 (rejecting that delay and intensity of merger negotiations rendered motive implausible when "the purpose of the fraud . . . was, in part, to accomplish the acquisition).[22]

## 2. The Complaint Pleads Strong Circumstantial Evidence of Scienter

Even if allegations of Defendants' motive to commit fraud, alone, do not establish a cogent and equally compelling inference of fraudulent intent, it is in the context of and together with Defendants' motive with respect to the Business Combination that this Court will evaluate the Complaint's allegations of circumstantial evidence. *Hain Celestial, Grp*, 20 F.4th at 137-38. Considering the allegations holistically, "a reasonable person would deem the inference of scienter at least as compelling as any opposing inference from the facts alleged." *Tellabs*, 551 U.S. at 323.

In this context, Defendants ignore several foundational facts that support a strong inference of scienter. For example, in its August 25, 2022, announcement, Latch disclosed that the Audit

---

[19] Heifetz-Li Decl. Ex. 1 at D-2; 11 (releasing shares individuals held on the earlier of one year or, in increments of 25%, Latch's stock price meeting certain targets).

[20] Heifetz-Li Decl. Ex. 3 at 112-113.

[21] *Id*.

[22] *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) is inapposite. According to the Second Circuit, a difference exists between lying *for* shareholders and lying *to* shareholders. Lying about an agreement that will benefit shareholders makes no economic sense. *Id.* at 140–41. Lying to shareholders to effectuate a business combination and then continuing that lie, however, does.

Committee found "material errors and possible irregularities." ¶141. "Irregularities" are an accounting term of art, meaning "intentional misstatements or omissions [] in financial statements." ¶58. In the face of analogous disclosure in *comScore*, this Court found that "inferences of misconduct that might be borderline in the absence of the disclosure are magnified and must be viewed with increased suspicion." 268 F. Supp. 3d at 551 (citations omitted).

Further, in January 2023, Defendants disclosed that the Investigation was substantially complete. ¶¶148-149. To date, however, Defendants have neither announced the results of the Investigation nor restated.[23] As a result, NASDAQ has delisted Latch. ¶157. Defendants assert that it has "prioritized accuracy over expediency—to its own detriment." Br.22. It is cogent and at least equally compelling, however, that Latch has sacrificed its listing in the hope that this Court will dismiss this case before Latch restates and discloses the results of the Investigation. ¶160.

Still further, soon after Latch disclosed that the Investigation was substantially complete, Schoenfelder separated from the Company. ¶146. Latch had already terminated Mitchell and demoted Hussain. ¶146, n. 5. In context of motive and "possible irregularities," the termination of Individual Defendants and others who, the Complaint alleges, spearheaded schemes to inflate revenue supports a strong inference of scienter. *comScore*, 268 F. Supp. 3d at 553 (timing and circumstances of separation from company support scienter inference for those separated).

The Complaint also pleads particularized allegations from CWs who were in positions to know the information they relate, rendering the cogent inference of scienter at least as compelling as Defendants' insistence on their good faith. First, by confirming CW2's allegations about

---

[23] As late as November 27, 2023, after 16 months, Latch claimed to be unable to estimate the timeframe for restating its results. ¶160. As of the filing of this Opposition Memorandum, Latch has neither restated nor disclosed the results of the Audit Committee's investigation.

booking revenue based on inflated prices to end users instead of on what channel partners paid, ¶¶43-47, Defendants support CW2's credibility and admit to intentionally materially inflating revenue.[24] *See, e.g., In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008) (corroborative nature of other facts alleged is relevant to whether allegations from a CW meet the PSLRA's particularity requirement). In the context of Defendants' understanding that increasing revenue was key to profitability, ¶46, their claim to offsetting revenue improperly by booking costs of goods sold so as not to decrease artificially Latch's net loss, ¶45, establishes Defendants' intent to inflate revenue artificially by any means. More, in the context of CW2's alerting the CFO function to this impropriety, ¶42, no reasonable inference supports that this scheme was the work of Latch's salesforce as opposed to senior executives. Defendants' no-harm no-foul defense thus fails. They concede that they took affirmative steps improperly, *see* ¶83, to inflate revenue.[25]

Second, Defendants assert that no CW had contact with Individual Defendants during the

---

[24] Defendants' corroborating CW2 about Latch's falsifying prices at which it booked revenue supports CW2's credibility with respect to the LPP, Latch's method of channel stuffing during the Cass Period. ¶48. In turn, CW2's credibility about LPP as a channel stuffing vehicle supports that CW3's allegation that LPP was the Class Period equivalent of the channel stuffing practices of which, CW3 alleges, Defendants had actual knowledge in 2019. ¶50.

[25] Defendants' attempt to sanitize this practice as accounting for "channel partner fees" concealed the fraud, eliminating the need to record the excess sales as accounts receivable. Latch's SEC filings reference "channel partner fees" over Individual Defendants' Sarbanes-Oxley certifications, ¶23(h), meaning Defendants knew what the financial statements contained. This supports a strong inference of management's actual knowledge that hardware invoice amounts—representing end-user pricing and not pricing to channel partners—inflated revenue artificially. *Cf.*, *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266–67 (11th Cir. 2006) (Sarbanes-Oxley certifications probative of scienter if the signer at least should have suspected the financial statements were false because of glaring accounting irregularities or other red flags).

Class Period. Br.20.[26] That is irrelevant. In *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001), the Second Circuit, reversing dismissal, ruled that pre-class period information confirming what a defendant knew in advance of the class period is relevant to evaluating a complaint's sufficiency. *Id.* at 72 (citations omitted); *see also City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 411 (S.D.N.Y. 2020) (denying dismissal, finding pre-class period allegations pertinent to scienter during the class period). Mitchell knew of improper channel stuffing before the Class Period. ¶50. Two years later, as Latch consummated the Business Combination, Chief Revenue Officer, Chris Lee, ¶36, confirming that he knew about improper revenue recognition, enticed CW3 to return to Latch, promising that Latch had cleaned up its practices to go public. ¶51. According to CW3, however, he quickly learned otherwise. ¶51.

More, before and during the Class Period, Mitchell was directly involved in Latch's loan to Whiz Cribs in exchange for Whiz Cribs' receiving and holding inventory for Latch that it did not intend to sell. ¶52. Nothing of record shows that Defendants ever ceased their pre-class period improprieties, and Latch's public disclosures do not separate its revenue recognition problems into pre-Class Period and Class Period. The Complaint establishes, therefore, the knowledge of these senior Latch executives of the very wrongdoing that would force Latch to restate.[27] With

---

[26] Arguing against scienter, Defendants otherwise ignore what the CWs conveyed. They concede, therefore, that the allegations, particularly from CW3, of pre-class period interactions with Defendant Mitchell, Hussain, and Scott Anderson about unsustainable channel stuffing are adequately particular allegations.

[27] Where the defendant at issue is a corporation, it is possible to plead corporate scienter by pleading facts sufficient to create a strong inference either (1) that "someone whose intent could be imputed to the corporation acted with the requisite scienter" or (2) that the statements "would have been approved by corporate officials sufficiently knowledgeable about the company to know" that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund*

knowledge of the impropriety before the Class Period, Defendants were minimally severely reckless for not correcting during the Class Period. *See Novak*, 216 F.3d at 308 (a complaint adequately pleads a reckless omission if it alleges that defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.").

Under the weight of these allegations, Defendants' claim to "good faith and prompt disclosure," DBr.22, collapses. Foundationally, Defendants' January 2023 disclosure indicates that from 2019 through Q12022, the errors necessitating revenue restatement resulted primarily from the same three problems. ¶148. Not only did Latch not cease falsifying revenue but knowing it had these issues, it did not restate 2019 and 2020 in advance of the Business Combination. This leaves Defendants with a Hobson's choice: either they knew of wrongdoing during the Class Period, indicating intent, or they were reckless in allowing the behavior to persist into the Class Period after having been aware of it. *Cf Handal v. Tenet Fintech Group Inc.*, 2023 WL 6214109, at \*16 (E.D.N.Y. Sept. 25, 2023) (a complaint pleads recklessness where defendants were on notice of possible wrongdoing). Defendants ask this Court to find that their pre-Class Period awareness of the same improprieties that existed from 2019 to 2022 does not establish their reckless disregard of those issues during the Class Period. Such an inference cannot be more compelling than the cogent inference that, with knowledge of past misconduct, Defendants were severely reckless about the same misconduct that persisted during the Class Period. *See, e.g., Orthofix*, 89 F.Supp.2d at 616-617 (finding scienter on the basis of recklessness in connection with revenue recognition).

Defendants' warnings about deficient internal controls, DBr.22, offer no refuge from the collapse of their inference's cogency. Defendants cite no case where disclosure of one specific control deficiency excuses other material deficiencies. On the contrary, Defendants' citation to

---

*v. Dynex Cap. Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)).

*Plumbers and Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc*., 2011 WL 1198712 \*21-22 (S.D.N.Y. Mar. 30, 2011) proves the opposite. There, the defendants' risk disclosures about weaknesses related directly to the information that the plaintiffs alleged was misleading. Here, by contrast, Defendants did not apprise investors that Latch's internal controls were insufficient to prevent purposeful manipulation of revenue. ¶96. While the securities laws do not require clairvoyance in disclosing risk, a defendant cannot self-exculpate, invoking a general risk warning of possible further control deficiencies to excuse then ongoing wrongdoing of which they were aware in advance of the Class Period. *See Evoqua Water Tech*., 450 F. Supp. 3d at 411-412 (generic warning of potential problem is not curative of already ongoing wrongdoing).

Last, but importantly, even if this Court finds that the Complaint fails to plead scienter against any Individual Defendant, it certainly pleads Latch's. *Loreley*, 797 F.3d at 177. The Complaint pleads with particularity that COO Hussain spearheaded revenue recognition improprieties, ¶49, and personally participated in a spring 2019 meeting with CW3 about improper channel stuffing. ¶50.[28] Mitchell and Vice President of Sales Scott Anderson also attended that meeting. ¶50. In addition, the Complaint pleads that Chris Lee knew of improper revenue recognition and enticed CW3 back to Latch in June 2021 with a promise that Latch had cleaned up its act in advance of going public. ¶51. These facts show that the Company's most senior sales and finance executives knew of improper revenue recognition practices up to the beginning of the Class Period, which they allowed to continue during the Class Period. This Court will impute the knowledge or recklessness of Hussain, Anderson, and Lee to Latch. *Loreley*, 797 F.3d at 177 (in

---

[28] Hussain was one of several senior executives to also create liquidity in his shares through the Business Combination and to sell shares in the July 8, 2021, offering. *See* Heifetz-Li Decl., Ex. 3 at 112-113.

context, court can impute scienter of non-speaker who is sufficiently senior to corporation). As such, Latch acted with scienter, even if the Court finds that the Individual Defendants did not.

### D.    The Complaint Sufficiently Pleads Loss Causation

A complaint adequately pleads loss causation if "the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016).[29] A corrective disclosure need not be a "mirror image" of the misstatement or omission, but must merely allege that "the 'truth' about the company's underlying condition, when revealed, cause[d] the 'economic loss.'" *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Either describing the precise fraud or disclosing the fraud constructively "through events" suffices to plead loss plead loss causation. *Id.* at 262.

The Complaint pleads corrective disclosures that show loss causation. On August 12, 2022, Defendants disclosed that Latch failed to timely file its Form 10-Q for the second quarter of 2022. On this news, the price of Latch common stock fell by 18.5%. ¶140. On August 25, 2022, Latch disclosed the preliminary findings of the Investigation, warning of a restatement and that investors should no longer rely on its 2021 and Q1 2022 financial statements "as a result of material errors and possible irregularities." ¶¶141. In response, Latch's stock fell by 12.2%. ¶142. On August 1, 2023, after Latch disclosed that it would miss the August 4, 2023 deadline to restate and NASDAQ would suspend its stock from trading. In response, Latch's stock fell by 45.8%. ¶¶157-158.

Defendants' argument that a corrective disclosure that the Complaint alleges caused Latch's stock price to increase, Br.23, is wrong. The Complaint pleads that after Latch's disclosure

---

[29] Rule 8(a) applies to loss causation allegations, requiring a short, plain statement. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *17 (E.D.N.Y. May 20, 2020) (quoting *Loreley*, 797 F.3d at 183). The theory of loss causation need only be "plausible." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 n.65 (2d Cir. 2020).

on January 23, 2023, that the Investigation was substantially complete, investors bid up the Company's stock because they saw a light at the end of the tunnel, with the end of the Investigation soon leading to the disclosure of its results and restatement. ¶¶148-149. ***This is not a disclosure, but a false statement.*** Defendants then withheld the Investigation results and restatement, and when investors realized they were not forthcoming, Latch's stock value dropped. ¶¶157-158.

The Complaint sufficiently pleads that when investors learned the truth about Defendants wrongdoing and their subsequent attempts to evade culpability, Latch's share price fell. The Complaint, therefore, adequately pleads loss causation.

### E.    The Complaint Adequately Pleads Control Person Liability

Because the Complaint adequately alleges a primary violation of § 10(b) and Rule 10b-5 and the Individual Defendants controlled PayPal, Plaintiffs have adequately alleged a *prima facie* case under § 20(a). *See* 15 U.S.C. § 78t(a); *comScore*, 268 F.Supp.3d at 556.

### IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.[30]

---

[30] In the event the Court finds that any count of the Complaint fails to state a claim, Plaintiffs should be granted leave to amend, which, under Fed. R. Civ. P. 15(a), "shall be freely given when justice so requires." The Second Circuit requires courts to be especially liberal in granting leave to amend in cases of dismissed securities fraud claims. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995); *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986) (noting with regard to dismissal of plaintiffs' 10b-5 claims that "[c]omplaints dismissed under Rule 9(b) [for failure to plead with particularity] are 'almost always' dismissed with leave to amend"). In this case, while Plaintiff believes that the Complaint sufficiently states a cause of action and this case should continue to discovery, if the Court disagrees, Plaintiff asks for the opportunity to amend after Latch finally restates its financial results.

Dated: January 18, 2024

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg
Leah Heifetz-Li
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Tel: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com
        lheifetz@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*